ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

KATHERINE R. BRANCH
Assistant U.S. Attorney
Arizona State Bar No. 025128
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
Facsimile:  602-514-7760
Email: Katherine.Branch@usdoj.gov
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CIV- |
| Plaintiff, | **MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER** |
| vs. | |
| Louis Jarges Akrawi, | |
| Defendant. | |

Plaintiff United States of America (the Government) asks this Court to grant an emergency temporary restraining order (TRO) directing its agencies, Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and the Public Health Service, Division of Immigration Health Services Corps (IHSC), to forcibly conduct reasonable and necessary medical and laboratory testing and monitoring of Defendant Louis Jarges Akrawi and, if necessary, to forcibly provide hydration and nutrition to Defendant.  This motion is supported by the following memorandum of points and authorities, by the attached exhibits, and by all matters of record.

. . .

. . .

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     BACKGROUND.

Defendant Louis Jarges Akrawi is a citizen of Iraq.   On March 24, 2009, an Immigration Judge ordered Akrawi removed to Iraq.  Ex. A, Decl. of Alejandro Almeida at ¶ 4.  Akrawi waived appeal and has not sought to reopen his removal proceedings.  Ex. A at ¶ 5.  Akrawi was detained by ICE in Detroit, Michigan, on May 22, 2017, and was transferred to the Florence Correctional Center in Florence, Arizona.  Akrawi's removal is stayed pursuant to a temporary restraining order issued by the District Court for the Eastern District of Michigan in *Hamama, et al. v. Adducci*, 17-cv-11910 (E.D. Mich. June 22, 2017) (Doc. 32).

On June 30, 2017, Akrawi declared a self-imposed hunger strike.  Ex. A. at ¶ 7.  Akrawi has stated that the purpose of his hunger strike is to protest his housing unit assignment. Ex. A at ¶ 8.  Akrawi has demanded to be housed with the other Iraqi nationals detained at the Florence Correctional Center (*id.*), but serious security concerns prevent him from being housed in that unit.  Ex. A at ¶ 9.  Akrawi has stated that he plans to continue his hunger strike until at least July 17 or 18, 2017 (Ex. A at ¶ 17), but has also stated that he wants to die and has the will do it via hunger strike.  Ex. B at ¶ 4.

As of the afternoon of July 7, 2017, Akrawi has refused 21 consecutive meals.  Akrawi accepted some ice chips in the early morning hours of July 5, 2017, and drank eight (8) ounces of water on the evening of July 6, 2017, but has otherwise declined water and nutritional support.  Ex. A at ¶ 11.  Akrawi is also refusing to take medications prescribed to him for hypertension and hypothyroidism.  Ex. A at ¶ 12.  Until the morning of July 6, 2017, Akrawi was allowing medical staff to monitor his vital signs, including measuring his weight and blood pressure, collecting urine samples for urinalysis, and obtaining blood samples for laboratory assessment.  Ex. A at ¶ 13.  On the morning of July 6, Akrawi refused to allow medical staff to assess him or take his vitals, and has refused subsequent

requests by staff to collect vitals, urine or blood to allow them to monitor his physical condition.  Ex. A at 14; Ex. B, Decl. of Stephen Graham, MD, OD, at ¶ 7.  On the evening of July 6, 2017, Akrawi was transported to Mercy Gilbert Hospital for evaluation for dehydration.  Ex A at ¶ 15; Ex. B at ¶ 8.  Akrawi refused evaluation or treatment by hospital staff, and was returned to the Florence Correctional Center the same evening.  Ex A at ¶ 16; Ex. B at ¶ 8.

Since Akrawi began his hunger strike, he has been repeatedly counseled by the medical staff and the detention staff about the physical effects of self-imposed dehydration and starvation, as well as involuntary hydration and feeding procedures to prevent his permanent injury and/or death in the event that he continues his hunger strike.  Ex A at ¶ 17; Ex. B at ¶ 5.  As of July 5, 2017, the last day Akrawi allowed his weight to be taken, he had lost 11 pounds since beginning his hunger strike.  Ex. B at ¶ 6.  If Akrawi continues his hunger strike, he is in jeopardy of sustaining severe dehydration and metabolic acidosis, which can lead to organ failure and death.  Ex. B at ¶¶ 6, 9.  Dehydration also decreases access to peripheral veins, which are necessary for placement of an IV to rapidly administer fluids in the event Akrawi ends his hunger strike.  Ex. B. at ¶ 10.  In addition, Akrawi's hypertension and hypothyroidism can be exacerbated by dehydration.  Ex. B at ¶ 7.

The urine sample provided by Akrawi on July 5, 2017, was positive for ketones.  Ex. B at ¶ 6.  The presence of ketones in the urine indicates that the body is burning fat tissue since there is limited glucose in the blood stream due to fasting.  Ex. B at ¶ 6.  Any reading above "0" is abnormal and is considered urgent.  *Id.*  A person can go from "+2" to "+10" within a day or two.  *Id.*  After time, this will send his body into metabolic acidosis and could cause death if not treated medically.  *Id.*  Without laboratory monitoring, vital signs, and daily weights, there is no way to tell to what degree Akrawi's condition is deteriorating.  Ex. B at ¶¶ 9, 11.

Based on Akrawi's current physical condition and the inability to monitor his medical status, it is Dr. Graham's informed medical opinion that involuntary medical and laboratory monitoring is necessary.  Ex. B at ¶ 11.  Depending upon the results of such monitoring, involuntary hydration and feeding measures may become necessary.  *Id.*  According to Dr. Graham, the following laboratory tests are needed:  urine (U/A and Culture) and blood (Glucose, Complete Blood Count, Chemical Panel) to check muscle wasting, protein and electrolytes.  IHSC needs at least a baseline labs and every other day afterwards to check deterioration.  The results of this testing will be available within 24 hours.  Ex. B at ¶ 12.

Dr. Graham has informed Akrawi that the United States Attorney's Office has been contacted and requested to seek an order allowing the medical staff to conduct involuntary laboratory testing, as described above, and possibly involuntary feeding.  Ex. B at ¶ 13.

## II.    ARGUMENT.

### A.    Standards governing issuance of temporary restraining order.

Pursuant to Fed. R. Civ. P. 65(b)(1), this Court may issue a temporary restraining order without notice only if:

> (A)    specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B)    the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

The purpose of a temporary restraining order is to "preserv[e] the *status quo* and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Reno Air Racing Assoc., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974)).

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434

U.S. 1345, 1347 n.2 (1977) (Rehnquist, J.); *Los Angeles Unified Sch. Dist. v. United States Dist. Court*, 650 F.2d 1004, 1008 (9th Cir.1981) (Ferguson, J. dissenting); *Brown Jordan Inter., Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Supreme Court has emphasized that a preliminary injunction cannot issue on the basis of speculation or possibility.  *Winter*, 555 U.S. at 20-24.

> **B.    The Government is likely to succeed on the merits.**

> > **1.    The Government has an obligation to prevent harm to Defendant.**

Defendant Akrawi is detained at the Florence Correctional Center by ICE pending his removal to Iraq.  Akrawi's detention is authorized by statute.  *See* 8 U.S.C. § 1231(a)(1). The United States is responsible for his proper treatment and care while he is in custody and during the removal process.  *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a)(2).

> > **2.    Defendant's constitutional rights are not violated by forced medical monitoring and, if necessary, forced-feeding and hydration.**

"'[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates.'"  *In re Soliman*, 134 F. Supp. 2d 1238, 1252 (N.D. Ala. 2001), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)).  Finding that the difficulties of prison administration warrant special consideration, the Supreme Court articulated a standard of review for prisoners' constitutional claims "that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'"  *Turner*, 482 U.S. at 85 (alteration in original)

5

(quoting *Procunier v. Martinez*, 416 U.S. 396, 406 (1974)).  In *Turner*, the Court held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.

The proper standard for determining the validity of a prison regulation or procedure claimed to infringe on an inmate's constitutional rights is to ask whether the regulation or procedure is "reasonably related to legitimate penological interests." *Id.* at 89; *In re Soliman*, 134 F. Supp. 2d at 1252.  The Supreme Court has identified four factors that serve to channel the reasonableness inquiry: (1) whether there is a "valid, rational connection" between the regulation and legitimate government interest; (2) whether there are alternative means of exercising the asserted constitutional right; (3) whether and to what extent accommodation of the asserted right will have an impact on prison staff, inmates, and allocation of resources; and (4) whether the regulation represents an "exaggerated response" to prison concerns.  *Turner*, 482 U.S. at 89-91; *see also Hakim v. Hicks*, 223 F.3d 1244, 1247-48 (11th Cir. 2000), *cert. denied,* 121 S. Ct. 1382 (2001) (applying *Turner* standard to free exercise of religion claim where prison officials refused to recognize inmate's religious name change); *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) (same). Under this standard, the constitutionality of forced medical monitoring and forced feeding of Akrawi should be upheld against any claimed infringement upon his First and Fourteenth Amendment rights because the Government can easily establish that the provision of life-saving medical and nutritional care to hunger striking detainees "bears a rational relation to legitimate penological interests." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The majority of courts that have considered the issue have held that force-hydrating or force-feeding orders do not violate a hunger-striking prisoner's constitutional rights. *See Aamer v. Obama*, 742 F.3d 1023, 1041, 1040 (D.C. Cir. 2014) (explaining that the "overwhelming majority of courts have concluded. . .that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death") (listing

6

cases); *In re Grand Jury Subpoena John Doe*, 150 F.3d 170, 172 (2d Cir. 1998) (per curium) ("In reviewing the district court's force-feeding order. . .we, like the majority of courts that have considered the question, hold that such an order does not violate a hunger-striking prisoner's constitutional rights."); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992), *cert. denied*, 507 U.S. 1009 (1993) (federal prisoner's allegation of force feeding by prison authorities did not state constitutional claim when attachments to pleadings reflected a medical determination that force feeding was necessary to the inmate's health, and that regulations authorized the force feeding of hunger striking inmates); *In re Sanchez*, 577 F. Supp. 7, 8 (S.D.N.Y. 1983) (rejecting hunger-striker's constitutional claims, stating that motive was to manipulate system to vacate his contempt order); *Bezio v. Dorsey*, 989 N.E.2d 942, 949-50 (N.Y. 2013) (Applying *Turner* test and upholding order that authorized state prison officials to intervene to prevent hunger-striking prisoner's death by feeding via nasogastric tube, if necessary); *McNabb v. Dep't of Corr.*, 180 P.3d 1257, 1265 (Wash. 2008) (State's interests in applying Department of Corrections' force-feeding policy to inmate outweighed inmate's right to refuse artificial means of nutrition and hydration).

Courts also have recognized that the significant government interests in prison and inmate safety and security outweigh any liberty interests that an inmate may have in refusing medical treatment. *See, e.g., Freeman v. Berge*, 441 F.3d 543, 546-47 (7th Cir. 2006), *cert. denied* 549 U.S. 824 (2006) (discussing why prisoners have reduced liberty interests in refusing life-saving medical treatment and refusing to eat); *Davis v. Agosto*, 89 Fed. Appx. 523, 528 (6th Cir. 2004) (forced suturing of an open wound against inmate's will did not violate inmate's due process or Eighth Amendment rights); *Parks v. McCoy*, 35 Fed. Appx. 239, 241 (7th Cir. 2002) (inmate forced to take tuberculosis medication against his will based on a misdiagnosis did not state a constitutional claim); *In re Grand Jury Subpoena John Doe*, 150 F.3d at 172 ("Other compelling governing interests, such as preservation of life, prevention of suicide, and enforcement of prison security, order, and

7

discipline outweigh the constitutional rights asserted by Doe in the circumstances of this case."); *Dumbrique v. Brunner*, No. 14-cv-02598-HSG, 2016 WL 3268875, at *5 (N.D. Cal. June 15, 2016) (finding prisoner had no constitutional right to refuse to eat nor a liberty interest in refusing to eat), *cf. Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (stating that federal courts will "disallow any attempt to second-guess the propriety of a particular course of treatment" chosen by prison doctors); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir. 1971) ("Obviously, courts cannot go around second-guessing doctors."); *Garza v. Carlson*, 877 F.2d 14 (8th Cir. 1989) (holding that "preservation of prisoners' health is certainly a legitimate objective, and prison officials may take reasonable steps to accomplish this goal.")

Here, Akrawi is not claiming a constitutional right to starve himself or refuse medical treatment, but rather, like the inmate in *Sanchez*, 577 F. Supp. 7, it appears that he is attempting to manipulate the system, *i.e.,* to obtain his preferred housing assignment by starving himself until the officials at the Florence Correctional Center acquiesce to his demand. *See* Ex. A at ¶ 8. Akrawi has stated that he wants to die and has the will to do it via a hunger strike. Ex. B at ¶ 4. Akrawi has refused food since lunch on June 30, 2017, and has had only a few ice chips and eight ounces of water since then. Ex. A at ¶¶ 10, 11. Since the morning of July 5, he has refused to allow medical staff to monitor his vital signs, or to collect blood or urine for analysis. Ex. A at ¶¶ 13, 14; Ex. B at ¶ 7. According to the physician who has been monitoring Akrawi's condition, prolonged absence of adequate hydration can result in severe dehydration and metabolic acidosis, which can cause permanent damage to vital organs and even death. Ex. B at ¶¶ 6, 9, 10. The onset of metabolic acidosis can be rapid and requires immediate medical intervention. Ex. B at ¶ 6. However, because Akrawi refuses to allow jail personnel to monitor his vital signs or provide any other medical care, it is not possible to know how compromised his physical

health may be at this time, or to know how soon medical intervention will be necessary to prevent death or permanent damage to his health.  Ex. B at ¶ 9.

Akrawi's behavior is making it impossible for the United States to fulfill its responsibility to provide adequate treatment and care to him, and is risking his permanent health and possibly his life.  *Id*; *see also In re Abdel Fattah,* 2008 WL 2704541, at *1 (M.D. Pa. July 8, 2008) ("The evidence is that lack of water causes an imbalance in electrolytes and potassium.  These deficiencies can have a serious impact on the heart, kidneys and liver.").  It is necessary for the government to monitor Akrawi's vital signs, daily weight, and laboratory testing of his blood and urine in order to assess his physical condition, and to force food and hydration upon Akrawi when his physical condition begins to decompensate such that his health and life are in imminent jeopardy of permanent injury.

### C.   The Government is likely to suffer irreparable harm in the absence of preliminary relief.

The Government has a legitimate interest in providing life-saving nutritional and medical care in order to preserve the life and prevent suicidal acts of individuals in its care.  As discussed above, courts have repeatedly recognized this interest in upholding involuntary feeding of prisoners and detainees.  Indeed, the federal regulations governing management of inmates who engage in hunger strikes "authorize medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger." *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992); *see* 28 C.F.R. §§ 549.60-66 (2012). The Government also has a statutory obligation and a constitutional duty under the Eight Amendment to safeguard the lives of individuals whom it detains.  *See* 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a)(2); *see generally DeShaney*, 489 U.S. at 199-200; *Estelle v. Gamble*, 429 U.S. 97, 102-05 (1976).

Moreover, it is well-established that an inmate hunger strike can have a significant destabilizing impact on the institution.  "If prisoners are allowed to kill themselves, prisons

would find it even more difficult than they already do to maintain discipline, because of the effect of a suicide in agitating other prisoners." *Freeman*, 441 F.3d at 547; *see also Bezio*, 989 N.E.2d 942, 950-51 ("[T]here is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution.") (collecting cases); *In re Soliman*, 134 F. Supp. 2d at 1253; *In re Grand Jury John Doe*, 150 F.3d at 172.  Further, "[p]rison officials who let prisoners starve to death would also expose themselves to lawsuits by prisoners' estates.  Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a federal civil rights suit." *Freeman*, 441 F.3d at 547; *see also Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012) (damages lawsuit against government officials related to suicide of Guantanamo Bay detainees); *Baires v. United States*, No. C-09-05171-CRB, 2011 WL 1743224, at *7 (N.D. Cal. May 6, 2011) (finding complaint stated claim for relief under the Federal Tort Claims Act for negligent medical care of immigration detainees).  The Government has a legitimate interest in avoiding such burdensome litigation.

The likelihood of irreparable harm to the Government if Akrawi is allowed to starve himself to death is substantial, as is the likelihood of irreparable harm to Akrawi.  The Government cannot adequately care for Akrawi as long as he refuses medical monitoring, and refuses food, water, nutritional support and medication.  To prevent irreparable harm to both the Government and Akrawi, the Government must be allowed to obtain vitals, blood and urine from Akrawi, and to administer appropriate nutritional support and fluids to him if his condition deteriorates such that his life and health are in jeopardy of immediate harm.

**D.     The balance of equities tips in the Government's favor.**

The public interest lies in preserving the health and safety of persons held in government custody, for whose welfare the public has assumed responsibility, and in avoiding the threat to the good order of the correctional center and to the safety of other

10

detainees if Akrawi is allowed to starve himself to death without Government intervention. Given the potentially dire consequences that would result if this motion is not granted, the balance of harms and the public interest clearly weigh in favor of granting the relief requested.

## III.  CONCLUSION.

An emergency temporary restraining order is necessary to preserve the *status quo* and prevent irreparable harm by preserving Akrawi's life and health.  Without a temporary restraining order permitting the Government to monitor Akrawi's weight and vital signs, to collect blood and urine samples for analysis, and to initiate forced-feeding and forced-hydration when it becomes medically necessary, Akrawi may be permanently injured or die.

For the foregoing reasons, the Government respectfully requests an Order permitting it, through competent medical practitioners employed by or contracted with the Public Health Service, IHSC, to involuntarily conduct medical monitoring of Defendant, including obtaining daily weight, vital signs, and urine and blood samples.  The Government further requests that the Order permit it to involuntarily administer fluids, food, and nutritional support via placement of a nasogastric tube when and if a qualified physician determines that Akrawi's medical condition requires immediate intervention to prevent his permanent injury or death.

The Government further requests that this Court set a status hearing at its earliest convenience, at which time the Government will be able to relay Defendant's status.

In the event Defendant begins to eat, the Government will file an immediate motion to vacate the temporary restraining order.

Respectfully submitted this 7th day of July, 2017.

ELIZABETH A. STRANGE
Acting United States Attorney

11

District of Arizona

*s/Katherine R. Branch*
KATHERINE R. BRANCH
Assistant U.S. Attorney

12

1

2                          **CERTIFICATE OF SERVICE**

3          I hereby certify that on July 7, 2017, I electronically transmitted the attached

4  document to the Clerk's Office using the CM/ECF System for filing and arranged for

5  served a copy, via hand-delivery, on the following who is not a CM/ECF registrant:

6                          Louis Jarges Akrawi #A018-935-864
                              Florence Correctional Center
7                                  1100 Bowling Road
                               Florence, Arizona  85133
8                                       Defendant

9

10  *s/Cindy Perez*
    U.S. Attorney's Office

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        13