Carl Takei (*admitted pro hac vice*)
ctakei@aclu.org
**AMERICAN CIVIL LIBERTIES UNION**
915 15th Street NW
Washington, D.C. 20005
Telephone: 202.548.6610

*Attorney for Defendant Louis Akrawi*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | No. 17-cv-02192-PHX-DGC |
|---|---|
| Plaintiff, | |
| v. | **RESPONSE IN OPPOSITION TO MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER** |
| Louis Jarges Akrawi, | |
| Defendant. | |

Defendant Louis Akrawi is a 68-year-old father and grandfather who fled Iraq 50 years ago because of persecution in that country of the Chaldean Catholic community, of which he is a member. He is among the 1,444 Iraqi nationals detained this year by Immigration and Customs Enforcement ("ICE"), which seeks their removal to Iraq despite the acknowledged risk of torture or death.

Mr. Akrawi was originally detained in Detroit, as were many of his fellow Chaldean Catholics. Because of his long opposition to the Ba'ath Party and Saddam Hussein, Mr. Akrawi is a father figure for many of the younger Detroit members of his church. He accepted in remarkably good humor his original detention and ICE's intentionally circuitous shuffling of the detainees through a variety of facilities before their arrival in the Florence Detention Center ("FDC"). His mood soured when a former ICE case manager, apparently annoyed that Mr. Akrawi was helping counsel his fellow detainees on their rights, ordered him removed to a separate "pod" in the FDC. Mr. Akrawi's separation prevented him from honoring his commitment to the families of

young detainees to tutor them on survival as members of a persecuted religious minority in Iraq, a country foreign to them. In protest, Mr. Akrawi began a hunger strike that prompted the government's request that the Court authorize it to forcibly end his protest.

As demonstrated below, the government's request for relief lacks merit under any potentially applicable legal standard. The government's initial filing was made during a time Mr. Akrawi was not only refusing to eat, but also not taking liquids or allowing monitoring of his health. On the advice of FDC physician Dr. Stephen Graham, Mr. Akrawi has resumed taking water and allowing medical monitoring, including weight measurements, blood draws, and urinalysis. He is in no imminent danger of death or severe bodily injury. There is accordingly no basis for the government's demand that the Court violate Mr. Akrawi's bodily integrity in order to end his hunger strike, which is constitutionally protected expressive conduct.

**I.     HUNGER STRIKING IS A FORM OF NONVIOLENT PROTEST PROTECTED BY THE FIRST AMENDMENT, AND MR. AKRAWI'S DECISION TO REFUSE MEDICAL TREATMENT IS A SUBSTANTIVE DUE PROCESS RIGHT.**

As an immigrant, Mr. Akrawi enjoys all of the protections of the Bill of Rights that are not expressly limited to citizens, including the First, Fifth, and Fourteenth Amendments. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (First Amendment); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1109 (9th Cir. 2001) (Fifth and Fourteenth Amendments).

Mr. Akrawi's hunger strike is a classic form of expressive conduct protected by the First Amendment. As the Supreme Court has observed, "[t]he passive nonviolence of King and Gandhi are proof that the resolute acceptance of pain may communicate dedication and righteousness more eloquently than mere words ever could." *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 450-51 (1990). *See also, e.g.*, *Stefanoff v. Hays Cnty., Tex.*, 154 F.3d 523, 527 (5th Cir. 1998) (prison hunger strike can be expressive conduct protected by the First Amendment).

The government seeks to dismiss the importance of Mr. Akrawi's First Amendment rights by claiming that he is merely "attempting to manipulate the system" to

secure a change in policy unrelated to the particular mode of protest he has chosen. Doc. 2, at 8. Of course, the same could be said of *any* hunger striker seeking to bring about a change in policy. Gandhi, for example, sought to use his hunger strikes to support the cause of Indian independence from Britain, not to convey a message about hunger striking as a tool of protest. Mr. Akrawi's decision to fast in protest of a prison placement that precludes him from helping fellow Christians avoid death or torture if forcibly returned to Iraq is unquestionably expressive conduct.

Mr. Akrawi likewise enjoys a substantive due process right not to be forcibly fed through a nasogastric tube. The Supreme Court has repeatedly held that competent persons have a due process right to refuse unwanted medical treatment. *See e.g.*, *Cruzan by Cruzan v. Dir., Miss. Dep't of Health*, 497 U.S. 261, 270, 281 (1990) ("[T]he Due Process Clause protects . . . an interest in refusing life-sustaining medical treatment[.]"); *Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Everyone, regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment."); *Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) (recognizing America's "long legal tradition protecting the decision to refuse unwanted medical treatment"). Notably, the government has not asserted that Mr. Akrawi is incompetent or otherwise unable to decide to voluntarily refuse treatment; it merely asserts the power to override his conscious choice to do so. Doc. 2, at 11.

## II. *YOUNGBERG*, NOT *TURNER*, IS THE CORRECT TEST FOR DETERMINING WHETHER THE GOVERNMENT MAY FORCE-FEED MR. AKRAWI.

### A. *Turner* Is Not the Correct Test for Civil Detainees.

In this case, the government seeks an order to forcibly end Mr. Akrawi's hunger strike by performing medical procedures on him against his will (including insertion of a nasogastric tube and the use of restraints to facilitate these forced procedures). Doc. 2-2, at 3-4. The government contends that *Turner v. Safley*, 482 U.S. 78 (1987), provides the framework for analyzing this sweeping request because *Turner* is "[t]he proper standard for determining the validity of a <u>prison inmate</u> regulation or procedure claimed to infringe

on an <u>inmate's</u> constitutional rights." Doc. 2, at 6 (emphasis added). However, Mr. Akrawi is not a "prison inmate" serving a criminal sentence. Rather, he is in the custody of ICE to effectuate his removal pursuant to civil enforcement processes. Accordingly, *Turner* is wholly inapplicable.[1]

Over the course of more than a century, the Supreme Court has consistently held that immigration proceedings—including detention—are civil rather than criminal proceedings. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (stating that immigration proceedings "are civil, not criminal"); *Wong Wing v. United States*, 163 U.S. 228, 237-38 (1896) (as civil detainees, those detained pending deportation could not be forced into hard labor). The Supreme Court has, logically, ruled that civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

Employing the *Turner* test to the constitutional rights of civil detainees would violate the Court's careful distinction between civil detainees and those serving criminal sentences. *See Turner*, 482 U.S. at 89. The Supreme Court has stated that an "important function of the corrections system is the deterrence of crime," carried out by keeping prisoners "isolated from the rest of society" and "work[ing] to correct the offender's demonstrated criminal proclivity." *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). It is "in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners." *Id*. at 823. In

---

[1] The government relies on only four cases that do not involve criminal custody: *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001), *Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014), *In re Grand Jury Subpoena John Doe*, 150 F.3d 170 (2d Cir. 1998), and *In re Sanchez*, 577 F. Supp. 7 (S.D.N.Y. 1983). Neither *Doe* nor *Sanchez* cite *Turner*. *Aamer* never decided whether *Turner* was the correct standard for Guantanamo detainees. *See* 742 F.3d at 1039 ("[W]e shall, for purposes of this case, assume without deciding . . . that we should use the *Turner* framework."). As for *Soliman*, which involved an INS detainee, the case neither cited *Youngberg v. Romeo*, 457 U.S. 307 (1982), nor did it seriously engage the significant distinctions between civil detainees and convicted prisoners. In this circuit, where *Jones v. Blanas* is the governing law, these omissions would be a basis for appeal.

contrast, the government has no cognizable interest in using civil detention to deter crime, correct "criminal proclivity," or punish wrongdoing. *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (warning against making civil commitment a "mechanism for retribution or general deterrence"); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188-89 (D.D.C. 2015) (granting preliminary injunction against policy of using general deterrence as a justification to detain immigrants).

In *Jones v. Blanas*, the Ninth Circuit held that civil detainees are entitled to better conditions even than pretrial criminal detainees, who in turn are entitled to better conditions than convicted prisoners. 393 F.3d 918, 932 (9th Cir. 2004). Specifically, the court distinguished between civil and criminal confinement by holding that a person "detained under civil—rather than criminal—process . . . is entitled to 'more considerate treatment' than his criminally detained counterparts." *Id.* (quoting *Youngberg*, 457 U.S. at 321-22); *see also Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *4 (D. Ariz. Nov. 18, 2016), *clarified on denial of reconsideration*, No. CV-15-00250-TUC-DCB, 2017 WL 467238 (D. Ariz. Jan. 3, 2017) (applying *Jones* to immigration detainees). In *Jones*, a civil detainee being held in a county jail, under the same conditions as people held in both pretrial and sentenced criminal custody, objected to this treatment as punitive and inconsistent with the civil nature of his confinement. *Jones*, 393 F.3d at 923. The Ninth Circuit concluded that "a presumption arises that Jones's year-long confinement in the general criminal population of the jail was punitive," and that unless the government rebutted this presumption, these conditions violated his substantive due process rights. *Id*. at 934.

The government may argue that because ICE has chosen to house its civil detainees in a jail, their rights should be downgraded to reflect the setting. However, *Jones* makes clear that its protections are based on the civil status of civil detainees, not the location of their confinement or even the detainee's prior criminal history. *See Jones*, 393 F.3d at 933 ("Civil status means civil status, with all the Fourteenth Amendment rights that accompany it."); *see also Lynch v. Baxley*, 744 F.2d 1452, 1463 (11th Cir. 1984)

(prohibiting Alabama emergency civil detainees from being held in jails altogether because conditions of confinement were unacceptable).

For all of these reasons, and particularly in light of the Ninth Circuit's consistent application of *Jones* to civil detainees, applying *Turner* to a civil detainee's hunger strike is clearly irreconcilable with *Jones*. Instead of applying *Turner*, the Court should be guided by case law on medication refusals and First Amendment rights from other civil detention contexts and from non-detention contexts. This would provide appropriate protections for the fundamental rights at stake in this case.

### B. *Youngberg v. Romeo* Provides the Correct Framework for Evaluating Forced Medical Interventions on a Civil Detainee.

To the extent the government is justifying force-feeding as a medical intervention, *Youngberg v. Romeo* provides the relevant framework. In *Youngberg*, the Supreme Court addressed the question of how to evaluate a civilly-committed individual's liberty interests in safety and freedom from bodily restraint against the government's interest in protecting both the respondent and those around him. 457 U.S. at 319-20. Romeo was an individual with severe mental disabilities who was civilly committed because his mother was "unable to care for him or control his violence." Inside the facility, he suffered frequent injuries (both from his own violence and from others), and was frequently kept in restraints for the protection of himself and other residents. *Id.* at 309-10. The court held that "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 321. Ultimately, the court concluded that while medical judgment "exercised by a qualified professional" carries a presumption of validity, a civil detainee's rights would be violated if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

The *Youngberg* test has been applied to civil detainees in a range of circumstances. *See, e.g.*, *Ammons v. Wash. Dep't of Social & Health Servs.*, 648 F.3d 1020, 1027-29 (9th

1  Cir. 2011) (unsafe conditions, specifically sexual abuse, in state-run mental institution); *Thomas S. v. Flaherty*, 902 F.2d 250, 252 (4th Cir. 1990) (conditions for mentally challenged adults in public psychiatric hospitals); *Clark v. Cohen*, 794 F.2d 79, 87 (3d Cir. 1986) (unnecessarily long civil commitment without community-living training). The same standard applies here to the government's request to force-monitor and force-feed Mr. Akrawi, a civil immigration detainee.

The government relies on three declarations—one from Alejandro Almeida, an ICE official with no medical expertise, and two from Dr. Stephen Graham, a physician—to support its medical arguments in favor of force-feeding. For the reasons set forth below, neither is sufficient to justify force-feeding Mr. Akrawi under the *Youngberg* standard.

### 1. Lay Hearsay Testimony by a Non-Qualified Non-Professional Should Not Benefit from a Presumption of Validity.

Under *Youngberg*, only the judgments of a qualified "professional" merit deference. A professional is a "person competent, whether by education, training or experience, to make the particular decision at issue." *Youngberg*, 457 U.S. at 322 n.29. Long-term medical treatment decisions "normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded." *Id*.

Judged by this standard, Mr. Almeida is not a professional qualified to make judgments about medical care. Nothing in his declaration provides a foundation for him to offer medical expert testimony. He provides no CV, describes no relevant education, degrees, or other qualifications, and offers nothing to establish he has any special expertise. *See* Doc. 2-1, at 3 ¶¶ 1-2. He merely makes hearsay characterizations of unidentified "administrative records," *see id.* at 3 ¶ 2 (citing "review of administrative records"), and hearsay characterizations of what unidentified "medical staff" have told him at unspecified times under unspecified circumstances, *see id.* at 4 ¶ 18. Accordingly, his opinions and speculations regarding medical care issues and the potential medical consequences of Mr. Akrawi's hunger strike lack foundation and should either be stricken

or accorded no weight.

### 2. Medical Testimony That Recommends Force-Feeding a Competent Adult Fails the *Youngberg* Test Because It Is a Substantial Departure from Accepted Medical Professional Judgment, Practice, or Standards.

Nor can the two declarations of the government's physician be read to justify forced feeding consistent with *Youngberg*, should the government still maintain that argument in light of changed circumstances. Because Mr. Akrawi has now agreed to take liquids and allow medical monitoring, in his supplemental declaration Dr. Graham appears to have backed away from his earlier position that the FDC medical staff has "no other option" than to obtain Court approval for highly invasive procedures. *See* Doc. 15-1, at ¶ 5.

Moreover, any medical opinion in favor of force-feeding a competent adult would "substantially depart[] from accepted professional judgment, practice or standards," *see Youngberg*, 457 U.S. at 323, because it would fail to take into account generally accepted medical ethics addressing hunger strikers and forced medical interventions, as well as standards of medical practice including those outlined in the ICE Performance-Based National Detention Standards (PBNDS). ICE detention standards clearly state that individuals in ICE custody have the right to make medical decisions including the right to refuse medical treatment. 2011 PBNDS § 4.2(V)(E) (as revised in 2016).[2]

More broadly, force-feeding is condemned by national and international medical authorities. *See* Declaration of Arthur Caplan, Ph.D dated July 12, 2017, attached as Exhibit A hereto ("Caplan Decl."), at ¶¶ 15-22; WMA, DECLARATION OF MALTA ON HUNGER STRIKERS, *Guidelines for the Management of Hunger Strikers* ¶ 13 (Nov. 1991) (revised Oct. 2006)[3]("Forcible feeding is never ethically acceptable."). More specifically, medical experts have spoken out against force feeding in cases where an individual is competent to make his or her own decisions about their medical care. *See* Caplan Decl.

---

[2] https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.
[3] https://www.wma.net/policies-post/wma-declaration-of-malta-on-hunger-strikers/.

¶¶ 4-8; Letter from AMA, to U.S. Sec'y of Defense Chuck Hagel (Apr. 25, 2013)[4] ("Where a prisoner refuses nourishment and is considered by the physician as capable of forming an unimpaired and rational judgment concerning the consequences of such a voluntary refusal of nourishment, he or she shall not be fed artificially."); ICRC, *Hunger strikes in prisons: the ICRC's position* (Jan. 31, 2013)[5] ("The ICRC [International Committee of the Red Cross] is opposed to forced feeding or forced treatment; it is essential that the detainees' choices be respected and their human dignity preserved.").

Accordingly, a medical recommendation in favor of force-feeding a competent adult would not be entitled to a presumption of validity under *Youngberg*. *See Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246 (2d Cir. 1984) (upholding the district court's finding that a school failed to guarantee the right of intellectually disabled students to safe conditions, after noting that conditions are unconstitutional where they "deviate from the 'professional judgment' standard"); *McCartney v. Barg*, 643 F. Supp. 1181, 1188 (N.D. Ohio 1986) (concluding that plaintiff with an intellectual disability housed in a state institution stated a claim under *Youngberg* where she made specific allegations that the "defendants based [treatment] decisions on administrative convenience at the expense of plaintiff's well-being" and the court found it "difficult to imagine that these actions would arise out of the exercise of considered professional judgment").

### a. The Alleged Security Interests Asserted by the Government Are Not Credible, Lack a Foundation, and Are Insubstantial.

In addition to medical arguments, the government relies on Mr. Almeida to provide various arguments for force-feeding Mr. Akrawi that can generally be characterized as security and administrative convenience arguments. For example, Mr. Almeida asserts that not force-feeding Mr. Akrawi could lead to negative detainee perceptions of ICE staff

---

[4] https://www.documentcloud.org/documents/694196-hunger-strikers-letter-04-25-13.html.
[5] http://www.icrc.org/eng/resources/documents/faq/hunger-strike-icrc-position.html.

that would in turn lead to "detainee violence and disruption," further hunger strikes, refusals to seek medical treatment, diversion of staff attention and resources, and negative perceptions of ICE in the community. Doc 2-1, at 4-5 ¶ 19. These predictions are speculative and lack a foundation.

As stated above, Mr. Almeida offers nothing that would make these statements rise above the level of lay opinion. Additionally, even if he were to provide live testimony that would bring him over the *Daubert* line with respect to some relevant areas of expertise, these opinions are so weak and unfounded that they would fail to justify the challenged practices even under *Turner*. Accordingly, they must also fail under the *Jones* standard. *See Jones*, 393 F.3d at 932 ("[W]hen a [civil] detainee is confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" (internal citation omitted)).

More fundamentally, Mr. Almeida's non-medical predictions are not entitled to deference precisely because they are non-medical in nature. In *Sharp v. Weston*, the Ninth Circuit addressed, *inter alia*, routine strip searches and other prison-like practices in a civil commitment facility for "sexually violent predators" who were civilly detained after completing their criminal sentences. *Sharp v. Weston*, 233 F.3d 1166, 1169-71 (9th Cir. 2000). The Ninth Circuit held that the district court properly refused to defer to the facility administrators' decisions to maintain these practices because they were adopted not to further the specific purpose of the facility (namely, treatment of sexually violent predators), but rather because they matched the Department of Corrections' policies. *Id.* at 1172 & n.3.

In the absence of such deference, the Ninth Circuit simply boils *Youngberg* down to its essential command of balancing one set of interests against the other. *See Youngberg*, 457 U.S. at 321 ("[W]hether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests."); *see also Mills v. Rogers*, 457 U.S. 291, 299 (1982) (in related context of

forcible medication of mental patients, citing *Youngberg* and balancing constitutional interest against state interest). In *Oregon Advocacy Center v. Mink*, the Ninth Circuit confronted a challenge to the extended detention of incapacitated criminal defendants in county jails while awaiting evaluation and efforts to restore them to competency. To decide the case, the Ninth Circuit directly balanced the criminal defendants' liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state. *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121-23 (9th Cir. 2003).

This balancing falls firmly on the side of Mr. Akrawi. To force-feed Mr. Akrawi would necessarily violate his right to freedom of speech and severely invade his right to bodily integrity—both of which are fundamental rights.

Meanwhile, almost all of Mr. Almeida's speculative bad outcomes pale in importance compared to these fundamental rights. A governmental interest in maintaining a positive "perception of ICE and its staff" in the community cannot be secured at the expense of the fundamental rights of individuals. *Cf.* Doc. 2-1, at 5 ¶ 19(h). Nor can fundamental rights of individuals be violated because respecting those rights could lead to events that "draw[] staff attention away from other detainees," *id.* at ¶ 19(g), require greater monetary expenditures on other people, *id.* at ¶ 19(e), encourage other hunger strikes or make the government lose leverage in negotiations with future hunger strikers, *id.* at ¶ 19(c) & (f), or suffer a "drain on staff time and resources and distract staff" due to possible future litigation, *id.* at 6 ¶ 19(i).

The only predictions by Mr. Almeida that could, if credible, potentially compete with Mr. Akrawi's fundamental rights are that failing to force-feed Mr. Akrawi could lead to violent disruptions within the facility. *See id.* at 4-5 ¶ 19(a) & (b). However, the chain of events that Mr. Almeida describes is, at best, exactly the kind of speculative, poorly-founded fear of disturbance that triggers extreme skepticism from courts in a wide range of contexts. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969) ("[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to

overcome the right to freedom of expression."). It begins with Mr. Almeida's statement that if Mr. Akrawi dies during his hunger strike, "[p]erceptions may be formed by the ICE detained population that ICE will simply let Mr. Akrawi die, without intervening to save him." Doc. 2-1, at 4 ¶ 19(a) (emphasis added). He provides no basis for his assumption that such perceptions would be formed by this population, nor does he provide any guidance regarding the relative likelihood of this event. If such perceptions are formed, he then posits that "[t]he detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the FCC." *Id.* at ¶ 19(a) (emphasis added). He does not offer an opinion regarding the likelihood that these perceptions would lead to disruptive activities, rather than completely legitimate methods of expressing frustration, such as complaints or petitions to ICE or facility administrators. Nor does he explain what he means by "disruption." In other words, the most substantial justification that Mr. Almeida can offer for forcibly invading Mr. Akrawi's right to bodily integrity and squelching his First Amendment rights is a wholly speculative, unfounded chain of events, each of which may or may not come to pass, and which may not even lead to any serious consequences in the end. That is insufficient.

### III. EVEN IF THE TURNER TEST APPLIED TO CIVIL DETAINEES LIKE MR. AKRAWI, THERE WOULD BE NO BASIS FOR ORDERING HIM SUBJECT TO FORCE-FEEDING.

Even if, as the government contends, *Turner* applies to this case, there is no basis for the Court to order that Mr. Akrawi be force-fed under the current circumstances. Even where it applies, *Turner* requires that the government meet the burden of persuasion with regard to four factors, at least three of which require rejection of the government's demand for immediate authorization of force-feeding. The *Turner* factors are: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether "there are alternative means of exercising the right that remain open to prison inmates," (3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the "absence of ready

1  alternatives" to the challenged policy. As to the fourth factor, "if an inmate claimant can
2  point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to
3  valid penological interests, a court may consider that as evidence that the regulation does
4  not satisfy the reasonable relationship standard." *Turner*, 482 U.S at 89-91. The
5  government fails to establish the first, third, and fourth factors.

6  The United States is seeking to deport Mr. Akrawi and dozens of other Iraqi
7  Christians to a country where, the Eastern District of Michigan has concluded, they face
8  likely torture or death.[6] It is accordingly ironic that the government contends Mr.
9  Akrawi's constitutional rights must yield to its interest in keeping him alive long enough
10 to be sent to face death elsewhere. Irony aside, the record demonstrates that Mr. Akrawi is
11 quite spry and in no imminent risk of death or severe injury.[7]

12 The government's initial Motion for Temporary Restraining Order asked for an
13 order allowing the United States to "forcibly conduct reasonable and necessary medical
14 and laboratory testing" and, "if necessary, to forcibly provide hydration and nutrition."
15 Doc. 2, at 1. At the time of the filing, Mr. Akrawi was not only declining to eat, but also
16 declining to drink water and refusing to allow medical staff to conduct medical
17 monitoring. This state of affairs caused Dr. Graham to opine in his initial declaration
18 dated July 6 that Mr. Akrawi was at "phenomenal risk of imminent and severe
19 dehydration." Doc 2-1, at ¶ 10.

---

[6] *See Hamama v. Adducci,* Case No. 17-cv-11910 (E.D. Wash.), Opinion and Order Regarding Jurisdiction dated July 11, 2017 (Doc. 64), at 6 ("Christians and other religious minorities face death, sexual slavery, and rape"), 20 ("Without a stay in place, deportations will begin immediately, which may mean a death sentence for some deportees."). Noting that the government did not contest that those deported from America to Iraq will face death, the Eastern District was unpersuaded by the government's argument that detainees should nevertheless be obliged to pursue relief after deportation. *Id.* at 20.

[7] The Court's Order dated July 11, 2017 denying Mr. Akrawi's request to be transported to appear in person (Doc. 13) made it clear that defense counsel's unartfully worded Memorandum in Partial Opposition inaccurately suggested defense counsel agreed Mr. Akrawi had become "excessively week." *See* Doc. 10, at 3. Defendant rejects that characterization. Defendant's badly made point was that the government's contention that Mr. Akrawi is "excessively weak" made it urgent that the evidentiary hearing not be postponed for logistical reasons, lest the government subject the perfectly sturdy Mr. Akrawi to forced-feeding in the interim.

Subsequently, Mr. Akrawi has had further consultations with Dr. Graham, and has voluntarily accepted recommendations from Dr. Graham. Mr. Akrawi has begun taking hydration and resumed allowing the medical staff to take blood and urine samples and monitor his height and weight. At Dr. Graham's recommendation, he has also begun taking a multivitamin and a thiamine vitamin. *See* Doc 15-1, at ¶¶ 4, 5, 6, 11. Mr. Akrawi's rehydration has eliminated the "phenomenal risk of imminent and severe dehydration" about which Dr. Graham expressed concern originally. Mr. Akrawi's agreement to allow medical monitoring likewise obviates the need for the Court to compel such monitoring.

All that remains in dispute is whether Mr. Akrawi should be forcibly fed. Perhaps someday the Court will be obliged to determine whether the government's interests outweigh Mr. Akrawi's constitutional rights. Under either test, however, that day is not today. Mr. Akrawi, while 68, is a tough man who previously conducted hunger strikes lasting 58 and 38 days. *See* Declaration of Louis Jarges Akrawi dated July 12, 2017, attached as Exhibit B hereto ("Akrawi Decl."), at ¶¶ 23-26. He is justifiably confident in his ability to understand when continued refusal to eat may unduly risk death or serious bodily injury. *Id.* at 26. While Mr. Akrawi's weight has fallen from 233 pounds to 211 pounds during his hunger strike, Doc. 15-1, at ¶ 9, he is not a tall man. According to Dr. Graham, Mr. Akrawi's current body mass index is currently 30.27 kg/m2, *id.*, which remains above the level at which the National Institutes of Health recommends weight loss. S*ee* NIH, THE PRACTICAL GUIDE: IDENTIFICATION, EVALUATION, AND TREATMENT OF OVERWEIGHT AND OBESITY IN ADULTS at 18 (Oct. 2000).[8]

As discussed above, the government's evidence that accommodating Mr. Akrawi's rights would lead to security risks or disruption consists entirely of a four-page declaration signed by ICE official Alejandro Almeida, which goes through a parade of horribles describing what "may" or "could" happen if Mr. Akrawi's condition substantially worsens

---

[8] https://www.nhlbi.nih.gov/files/docs/guidelines/prctgd_c.pdf.

-14-

1. and he dies as a result of his hunger strike. *See* Doc. 2-1, at 4-6 ¶ 19. The *Turner* standard is deferential, but "not toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). "Although prison officials may pass regulations in anticipation of security problems, they must at a minimum supply some evidence that such potential problems are real, not imagined." *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 882 (9th Cir. 2002). Prison officials may not "pil[e] conjecture upon conjecture" to justify their policies. *Reed v. Faulkner*, 842 F.2d 960, 963-64 (7th Cir. 1988). To show a likelihood of success on the merits, the government must provide actual evidence, not imaginative conjectures.

Mr. Akrawi has previously stated that if housed with other Iraqi Christians, he would end his hunger strike. Akrawi Decl., at ¶ 18. Thus, ICE has a clear, ready alternative to force-feeding him available to it, based on Mr. Akrawi's own words. However, the only reason that the government provides for denying this request is the following line from the Almeida declaration: "Serious security concerns prevent Mr. Akrawi from being housed in the same unit as the other Iraqi nationals." Doc. 2-1, at 3 ¶ 8. Mr. Almeida does not specify what these concerns are, what facts support them, and how he knows those facts. He states that his declaration relies on "my personal knowledge and review of administrative records," *id.* at ¶ 2, but his declaration identifies nothing— not even a personal interview with Mr. Akrawi—that would provide such personal knowledge, and fails to identify what "administrative records" he reviewed to draw this conclusion. "Prison authorities 'cannot avoid court scrutiny [under *Turner*] by reflexive, rote assertions.'" *Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir. 2001) (quoting *Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir. 1996)). Neither should immigration enforcement officials.

ICE's detention policies, embodied in the 2011 PBNDS, provide a readily available, less intrusive alternative to force-feeding Mr. Akrawi if his medical condition becomes imminently life-threatening.[9] *See* 2011 PBNDS § 4.7 (Terminal Illness, Advance

---

[9] The 2008 PBNDS (which may apply to Florence) contain parallel provisions that are essentially indistinguishable from the 2011 PBNDS provisions discussed here. *See*

Directives, and Death). Under the 2011 PBNDS, when a detainee's medical condition "becomes life-threatening," officials are directed to "[a]rrange the transfer of the detainee to an appropriate off-site medical or community facility if appropriate and medically necessary." *Id.* § 4.7(V)(A). Upon transfer to a community hospital, the hospital assumes medical decision-making authority, and "the hospital's internal rules and procedures concerning seriously ill, injured and dying patients shall apply to detainees." *Id*. In other words, if the hospital's internal rules and procedures conform to standard medical ethical rules by prohibiting force-feeding of competent adult patients, then a hospitalized hunger striker will receive care consistent with those policies. It is not clear why ICE would object to adhering to its own policies and permitting the community hospital to provide care consistent with its own procedures.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the government's request to authorize forced feeding of Mr. Akrawi.

---

2008 PBNDS, *Terminal Illness, Advance Directives, and Death* (Dec. 2, 2008), https://www.ice.gov/doclib/dro/detention-standards/pdf/terminal_illness_advance_directives_and_death.pdf.

Dated: July 13, 2017                **PERKINS COIE LLP**

By: s/ *Christopher D. Thomas*

 Kathleen E. Brody (#026331)
 ACLU FOUNDATION OF ARIZONA
 3707 North 7th Street, Suite 235
 Phoenix, Arizona 85013

 Carl Takei (*admitted pro hac vice*)
 AMERICAN CIVIL LIBERTIES UNION
 915 15th Street NW
 Washington, D.C.  20005

 Christopher D. Thomas (#010482)
 Daniel C. Barr (#010149)
 Sambo Dul (#030313)
 2901 North Central Avenue, Suite 2000
 Phoenix, Arizona 85012-2788

*Attorneys for Defendant Louis Jarges Akrawi*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2017, I electronically filed the foregoing with the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrant Katherine R. Branch, Katherine.Branch@usdoj.gov, and emailed a copy to:

Kathleen Erin Brody
kbrody@acluaz.org

Billy Peard
bpeard@acluaz.org

Victoria Lopez
vlopez@aclu.org

David Faith
dfaith@aclu.org

s/ *Katherine E. May*

136197011.1