# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) **CV-17-02192-PHX-DGC** |
| | ) |
| vs. | ) Phoenix, Arizona |
| | ) July 13, 2017 |
| Louis Jarges Akrawi, | ) |
| | ) |
| Defendant. | ) |
_____)

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

<u>TEMPORARY RESTRAINING ORDER HEARING</u>

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

3    For the Plaintiff:

4            US Attorney's Office
             By: **KATHERINE R. BRANCH,** ESQ.
5            2 Renaissance Sq., Ste. 1200
             40 N. Central Ave.
6            Phoenix, AZ  85004

7

8    For the Defendant:

9            Perkins Coie, LLP
             By: **CHRISTOPHER D. THOMAS,** ESQ.
10           By: **SAMBO DUL,** ESQ. (telephonically)
             P.O. Box 400
11           Phoenix, AZ  85001

12

             ACLU
13           By: **CARL TAKEI,** ESQ.
             915 15th St. NW, 7th Fl.
14           Washington, DC  20005

15

             ACLU
16           By: **KATHLEEN E. BRODY, ESQ.,** ESQ.
             By: **WILLIAM PEARD,** ESQ. (telephonically)
17           P.O. Box 17148
             Phoenix, AZ  85011
18

19

20

21

22

23

24

25

1        **I N D E X**

2        <u>**EXAMINATION**</u>

3     <u>**WITNESS**</u>                                              <u>**PAGE**</u>

4  DR. STEPHEN GRAHAM

5          Direct Examination By Ms. Branch              16

6          Cross-Examination By Mr. Thomas               24

7          Redirect Examination By Ms. Branch            34

8          Further Cross-Examination By Mr. Thomas       36

9  LOUIS AKRAWI

10         Direct Examination By Mr. Thomas              37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

10:07:04  1
2          THE COURTROOM DEPUTY:  Civil case 2017-2192, United
3      States of America versus Louis Akrawi, on for temporary
4      restraining order hearing.
10:14:46  5          Will the parties please announce.
6          MS. BRANCH:  Your Honor, Katherine Branch on behalf
7      of the United States.
8          THE COURT:  Good morning.
9          MR. TAKEI:  Your Honor, Carl Takei on behalf of
10:14:56  10     Mr. Akrawi.
11         MR. THOMAS:  Chris Thomas, Perkins Coie, on behalf of
12     the defendant as well.
13         MS. BRODY:  Good morning.  Kathy Brody from the ACLU
14     of Arizona, also on behalf of Mr. Akrawi.
10:15:08  15         Your Honor, my colleague from the ACLU of Arizona,
16     William Peard, is on the phone with Mr. Akrawi in Florence.
17         THE COURT:  All right.  Thank you.
18         Let's have folks on the phone identify themselves.
19         DR. GRAHAM:  Dr. Graham is here.
10:15:23  20         MR. AKRAWI:  Louis Akrawi is here.
21         MR. PEARD:  This is William Peard, attorney for
22     Mr. Akrawi.
23         MR. ALMEIDA:  Good morning.  This is Alejandro
24     Almeida.  I'm the Interim OIC at the Florence Service
10:15:35  25     Processing Center.

10:15:38    1          MS. DUL:  And also on the phone is Sambo Dul from

        2    Perkins Coie on behalf of Mr. Akrawi as well.

        3          THE COURT:  Okay.

        4          All right.  We are here for a hearing on the TRO that

10:15:52    5    was entered last Saturday.  I set this hearing viewing this as

        6    probably the first date when people reasonably could be

        7    prepared to address the issue, particularly with counsel.

        8          I have reviewed the supplemental declaration that the

        9    government provided yesterday from Dr. Graham.  This morning I

10:16:17   10    saw the response from Mr. Akrawi's counsel.  I have only had

       11    time to read the response.  I have also read Mr. Akrawi's

       12    declaration.  I have read the first three sentences of

       13    Exhibit A. That's all I could get to before I was called in.

       14          I've looked briefly at the *Youngberg* case but at no

10:16:43   15    other case law.  I've read the cases that were cited in the

       16    government's motion.

       17          I did check as late at 7 or 8 last night and it

       18    wasn't filed.  It looks like it came in about 2 this morning.

       19          I'm assuming, Ms. Branch, you haven't had time to

10:17:01   20    digest it in great detail either.

       21          MS. BRANCH:  That's correct.

       22          THE COURT:  Nonetheless, I think we need to decide

       23    what we do going forward from today.  I guess I'd like to

       24    start, Ms. Branch, by getting your thoughts on what we ought

10:17:11   25    to do this morning and how long it should last.  Should we

10:17:15  1  have other hearings?  What should they encompass?

2         MS. BRANCH:  Sure.

3         Your Honor, at the time the government sought the

4  temporary restraining order, Mr. Akrawi was not allowing any

10:17:28  5  sort of medical monitoring and he was also not consuming any

6  liquids.  Since the order was entered last Saturday morning,

7  Mr. Akrawi has been eating ice chips, and so last week the

8  primary concern was dehydration because it was a risk he faced

9  most imminently.  Since the order was entered he has been

10:17:49 10  hydrating.

11        He is experiencing some physical symptoms of not

12  eating, lightheadedness and dizziness.  But he's otherwise in

13  no apparent immediate physical distress from malnutrition.

14        And so I think what the government would propose

10:18:05 15  would be to continue with the temporary restraining order to

16  allow for medical monitoring.

17        At this point the government hasn't had to forcibly

18  monitor Mr. Akrawi.  He's been allowing the monitoring to

19  happen because he knows the order is in place, is what my

10:18:21 20  understanding is.  So continue the TRO to allow for medical

21  monitoring.  Then, if it becomes apparent that he is in some

22  sort of distress, we can come back to the Court and ask for or

23  apply for a force-feeding order at that time with additional

24  medical evidence supporting the need for the force feed order.

10:18:41 25        THE COURT:  So, Ms. Branch, are you suggesting I

scale the TRO back to allow nothing more than medical

monitoring?

          MS. BRANCH:  I mean, I do understand that Mr. Akrawi

and his attorneys have concerns about the breadth of the order

at this point.  I think the courts have been sensitive to the

fact that people, detainees, prisoners, can stage these hunger

strikes as a form of protest.

          I know Mr. Akrawi has stated he has had hunger

strikes that lasted as long as 60 days in the past.  And so

being cognizant of those things, if I could get everything I

wanted, I think that -- I don't think that there is a

constitutional harm that is not redressable in keeping the

force feed order in place in the event it becomes medically

necessary.

          My understanding from speaking with medical

professionals is that barring some sort of underlying medical

issue that's not known about, it's not that Mr. Akrawi's

physical condition will deteriorate so quickly that we would

not be able to come into court to have a second hearing to

specifically address the force-feed issue.

          THE COURT:  If we went that direction, how quickly do

you think you and I and defense counsel would need to act if

the government concluded that force-feeding was needed?

          MS. BRANCH:  To be honest with you, I don't know off

the top of my head.  Dr. Graham may be able to say, you know,

10:20:17  1    the markers in the urine hit this point or he passes out or,

2    you know, that there would be a triggering event that would

3    indicate that his permanent injury or death from malnutrition

4    is imminent.  But I just -- I don't have the medical expertise

10:20:38  5    to speak whether that is -- my understanding is it's not

6    something that happens in the course of 12 hours, it would be

7    a couple of days' period.

8         THE COURT:  So are you proposing we do anything this

9    morning in terms of taking hearing or holding argument on the

10:20:55  10   legal issues that have been made in the motion and response?

11        MS. BRANCH:  I've only briefly had an opportunity to

12   review the response.  I disagree with some of the -- not the

13   case law they cited, but how they interpreted the case law and

14   how they applied it to the principles in this case.

10:21:13  15        I think the case law is very well settled that

16   whether you are a civil detainee or whether you are a criminal

17   detainee, whether you are an immigration detainee, you have no

18   constitutional right to starve yourself to death, that there

19   are penological interests that outweigh any constitutional

10:21:30  20   interest that you may have in the sovereignty of your own body

21   in that context.

22        And, you know, the medical ethics notwithstanding, I

23   think this particular issue was addressed in the *Aamer*

24   decision where the court said we're not a medical ethics

10:21:46  25   board, we're a court of law.  It may be true that the medical

literature says that, you know, it's not ethically proper to force feed a competent adult, but it's a different standard that applies in these types of cases.

And so -- I've forgotten what Your Honor's question was. Oh, in terms of addressing the underlying motions today. I mean, I'm prepared to discuss the grounds for getting the temporary restraining order. I'm less prepared to rebut the issues that were raised in this morning's filing. But if you -- I have witnesses available if you want to take testimony on either the medical stuff that undergirded the temporary restraining order or if you would like to address the penological interests at play.

THE COURT: Okay. Let me hear first from defense counsel on their views of what we ought to be doing today.

Mr. Thomas.

MR. THOMAS: Good morning, Your Honor.

It appears to me that, as we had anticipated, the government is no longer contending that the Court needs to enjoin our client today on the force-feeding issue and I apologize the papers were filed so late last night. It's been an interesting several days. But defendant does not object to either taking liquid or allowing the continued non-intrusive medical monitoring, which takes care of all of the relief sought by the government except for the forcible restraint and feeding tube issues.

And if I understand Ms. Branch correctly, the government does not contend that the Court needs to order that today. We have the luxury of more time to address whether that's immediately permissible as a constitutional matter.

I would suggest, since we're all here today and the next time we convene we may or may not have some greater urgency, that we proceed with the witness testimony on some of the issues that ultimately will be relevant to the potential day in the future when you need to decide whether the *Youngberg* test applies or whether the *Turner* test applies, and we can knock that issue out, and then hopefully at that time all we would need to address would be final resolution of the legal issue and also a change in the underlying imminence of harm to Mr. Akrawi.

I'd also like to note we do not object to Ms. Branch having a chance to further argue in the future the legal issue. Mr. Takei has flown in from DC for the purpose of addressing that issue. So without prejudice to counsel for the government having a chance to additionally respond to his argument, we would ask that in addition to the witness testimony be taken this morning he has a chance to present that argument. That might save him from a second to trip to Phoenix from DC in the future if we reconvene.

THE COURT: Mr. Thomas, are you saying the defendant would be agreeable to my leaving in place a TRO that calls for

10:25:12 1    medical monitoring and hydration but not for forced feeding?

2             MR. THOMAS:  That's correct.  That's the position

3    taken in our papers from last night and his declaration.

4             THE COURT:  I think your counsel wants to confer

10:25:28 5    about that.

6             (Defense counsel confer.)

7             MR. THOMAS:  Probably need to clarify, but our client

8    is -- we would object to any restraint of Mr. Akrawi if

9    circumstances change and he decides to opt out of the

10:25:55 10   monitoring component or other component.  Right now as a

11   result of some discussions with Dr. Graham, he's been taking

12   multivitamins, he's been taking liquids.  Nobody has contended

13   that he needs to be forced to get the forced feeding through

14   the nose issue, so that's not really ripe for resolution today

10:26:17 15   under the facts, I believe.

16            THE COURT:  So if I hear what you're saying, you

17   don't object to an order which calls for continued medical

18   monitoring.  You don't object to an order that calls for

19   hydration.  You do object to forced feeding and you do object

10:26:35 20   to physical restraint in order to accomplish what is otherwise

21   in the TRO?

22            MR. THOMAS:  Correct.

23            THE COURT:  Okay.

24            MR. THOMAS:  And if I could add one more thing, Your

10:26:51 25   Honor.  The -- it was clear to me when you issued your order

10:26:57 1    about the habeas issue that we had confused the Court about

2    the condition of our client.  By no means do we consider him

3    to be in excessively weak condition.  I was trying to convey

4    two things:  One was that our client felt a sense of urgency

10:27:15 5    because that was the position of the government and he feared

6    that, absent the ability to be heard by the Court this

7    morning, that he might be force fed, which he objected to.  So

8    that was the reason for our urgency.

9         I saw him Tuesday and I'm willing to bet that he

10:27:36 10   feels better today than I do.  He's quite spry, and although

11   he's lost a little bit of weight over the past two weeks, he's

12   gone from, like, 233 pounds to 211.  So there absolutely is no

13   imminent danger to him, and to the extent that my filing

14   suggested otherwise, that was my mistake.

10:28:00 15        THE COURT:  Well, just so you don't think your filing

16   was the basis for my action, if you had said nothing about his

17   physical condition, I would have come down the same way

18   because the only evidence I had before me yesterday was that

19   he was in grave danger and that he hadn't been eating or

10:28:15 20   drinking for a long time.  And I've learned over the years

21   that, although it doesn't appear obvious when you haven't

22   known the details, transport from one of these facilities is a

23   very rigorous thing for a detainee.  So I wasn't going to

24   order it for somebody who appeared to be in serious medical

10:28:33 25   condition without some affirmative showing he was able to

10:28:36  1   withstand the rigors of transport.

2   So it wasn't the just the statement in your order --

3   your motion that made me do that, it was the absence of any

4   evidence that he was doing all right.  It now sounds from what

10:28:49  5   you've said that he's spry, as you say.  But it wasn't just

6   your wording that caused me to come to that conclusion.  I was

7   genuinely concerned about whether transporting, which can mean

8   getting somebody up at 1 in the morning and putting them

9   through a series of screening and putting them on a bus and

10:29:06  10  holding them in a cold cell, was something this individual

11  could tolerate given what I knew about his condition.

12          MR. THOMAS:  Understood.  We obviously had a little

13  difficulty getting into the detention center for purposes of

14  getting a declaration to submit to the Court.

10:29:22  15          THE COURT:  Okay.  All right.

16          Okay.  Well, we've got counsel from DC here.  I'm

17  happy to hear what you have to say.

18          Ms. Branch, I would be interested learning from

19  Mr. Graham -- I should say Dr. Graham his assessment of how

10:29:42  20  Mr. Akrawi is doing now and how quickly he thinks we may need

21  to act if Mr. Akrawi either decides to stop taking liquids or

22  if his lack of nutrition creates a serious health issue so

23  that I can have a sense whether it's reasonable to say we'll

24  postpone the nutrition decision.

10:30:12  25          And I know you haven't had time to digest what's in

10:30:17  1   the government's response.  I'll certainly give you that

      2   opportunity before I make any permanent decision, but I think

      3   it's fair to hear what counsel has to say since he traveled

      4   from DC.

10:30:26  5          So thanks, Mr. Thomas, for those comments.

      6          Ms. Branch, if you would, could you cover those

      7   issues with Mr.-- I'm sorry, Dr. Graham just so that I have a

      8   better sense of how he thinks Mr. Akrawi is doing now and how

      9   imminently we may need to act if he thinks he takes a turn for

10:30:46 10   the worse.

     11          MS. BRANCH:  Dr. Graham, are you still here?

     12          DR. GRAHAM:  I am here.

     13          So I'd like to, if I could, perhaps preface things

     14   with a little bit --

10:30:57 15          MS. BRANCH:  Doctor --

     16          THE COURT:  Dr. Graham.  Dr. Graham.

     17          DR. GRAHAM:  Yes.

     18          THE COURT:  Hold on just a minute.  We need to do two

     19   things.  One is we need to put you under oath since this is

10:31:05 20   testimony in a court proceeding, and, secondly, we need to

     21   proceed by question and answer.  So --

     22          DR. GRAHAM:  Oh.  Okay.

     23          THE COURT:  I'm sure you've got things you want to

     24   say, but let's have Ms. Branch ask the questions, and I'll

10:31:17 25   give defense counsel an opportunity to ask questions as well.

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:31:21  1       So, Traci, would you put him under oath, please.

2       (The witness was sworn.)

3           THE COURT:  Okay.  Ms. Branch, go ahead.

4               **DR. STEPHEN GRAHAM,**

5   called as a witness herein, after having been first duly sworn

6   or affirmed, was examined and testified as follows:

7           D I R E C T   E X A M I N A T I O N

8   BY MS. BRANCH:

9   Q    Dr. Graham, can you state and spell your last name for the

10:31:46  10  record, please.

11  A    Stephen, S-T-E-P-H-E-N, middle name Joseph, J-O-S-E-P-H,

12  last name Graham, G-R-A-H-A-M.

13  Q    And you're a medical physician, sir; is that correct?

14  A    That's correct.

10:32:05  15  Q    Can you tell me where you received your medical training?

16  A    Which part of it?  I have two doctorates and four board

17  certifications.

18  Q    How about starting with your undergraduate degree and

19  going through your professional training, could you describe

10:32:17  20  that, please.

21  A    Okay.  Undergraduate degree.  St. Lawrence University

22  degree in chemistry and biology '76 to -- excuse me, '73

23  through '76.  '76 through '80, doctorate in optometry New

24  England College of Optometry in Boston Massachusetts.  1981

10:32:32  25  to -- 1980 to '81, residency in optometry, University of

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:32:35  1    Miami --

2              THE COURT:  Excuse me, Dr. Graham.  Dr. Graham.

3              THE WITNESS:  Yes.

4              THE COURT:  We've got a court reporter trying to keep

10:32:43  5    up with you and she's not succeeding.

6              THE WITNESS:  Oh.  I know, my sister's a court

7    reporter.

8              THE COURT:  If you could just slow down a little bit.

9              THE WITNESS:  You wanted it all.

10:32:54 10             THE COURT:  Slowly.

11   BY MS. BRANCH:

12   Q   I think you left off at Miami University, was that right?

13   A   My residency after optometry for a year between 1980 and

14   '81 was University of Miami Bascom Palmer Eye Institute.

10:33:13 15             Then from 1980 to 19- -- excuse me, '81 to '85,

16   medical school at University of Miami.

17             19- --

18   Q   And then -- I'm sorry.  Go ahead, sir.

19   A   1985 to 1986, internship at Presbyterian St. Luke's

10:33:35 20   Medical Center in Denver, Colorado.

21             1986 through '89, ophthalmology residency at Boston

22   University and Harvard combined program in Boston Maciel.

23             1989 to 1991, aerospace medicine of the United States

24   Air Force School of Aerospace Medicine in Texas.

10:34:08 25   Q   And, sir, who is your current employer?

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:34:13  1   A   CoreCivic.

       2   Q   And where are you employed, sir?

       3   A   At what used to be called Florence Correctional Center,

       4   now it's Central Arizona Florence Correctional Complex,

10:34:25  5   hyphen, East.

       6   Q   And how long have you been at -- I'm just going to call it

       7   the Florence Correctional Center.  That's how we've been

       8   referring to it.

       9   A   I would do that, too.

10:34:34 10   Q   How long have you been at the Florence Correctional

      11   Center?

      12   A   Ten months.

      13   Q   And were you working with CoreCivic prior to arriving at

      14   Florence?

10:34:45 15   A   No.  I was working with the State at Eyman Prison at

      16   Special Management Unit One.

      17   Q   Sir, how much experience do you have in the prison or

      18   detention context?

      19   A   Three years.

10:35:01 20   Q   And I understand that you have been treating Mr. Akrawi

      21   for the last couple of weeks; is that true?

      22   A   Yes.

      23   Q   And can you describe for me how you came to meet

      24   Mr. Akrawi.

10:35:13 25   A   I met him first for his initial health appraisal.

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:35:19  1  Q  Do you recall when that was, sir?

2  A  Approximately two and a half weeks or so ago, three weeks

3  ago.

4  Q  And when did Mr. Akrawi next come to your attention?

10:35:31  5  A  I saw him about -- not too far after that for his chronic

6  care examination for his thyroid and blood pressure.

7  Q  And at some point did it come to your attention that

8  Mr. Akrawi had declared a hunger strike?

9  A  Yes.

10:35:50  10  Q  Did you see him when he declared his hunger strike?

11  A  No.

12  Q  When did you first see him after he declared his hunger

13  strike?

14  A  Probably about a day or so.  Shortly after -- I think on

10:36:05  15  the 1st or so of July.

16  Q  And I know that you've been present on the line.  The

17  judge has some specific questions.  I don't know how much of

18  the medical history is necessary, but can you describe for me

19  what Mr. Akrawi's current condition is.

10:36:22  20  A  His current condition, he's fortunate to have the

21  physiologic makeup of a teenager.  He is in infinitely better

22  physiologic condition now than he was on the -- excuse me --

23  when he ended the non-hydration part.  When he began to drink,

24  he became exponentially more improved.

10:36:52  25  Q  And you submitted several affidavits in this case.  The

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:36:56  1  first affidavit you submitted was dated July 6 of 2017.  At

2  that point was Mr. Akrawi hydrating at all?

3  A    No.

4  Q    And can you describe for me what his medical condition was

10:37:09  5  when he was not hydrating?

6  A    He was somnolent, not particularly easily responsive.  He

7  was extremely orthostatic, meaning he was -- wasn't able to

8  get enough fluid up to his brain to stand up.  And he was a

9  little bit on the ornery side then, but no more than I would

10:37:32 10  be at that time, at that point.

11  Q    And do I understand from your earlier testimony that after

12  Mr. Akrawi began accepting hydration that his physical

13  condition improved?

14  A    Yes.  I saw him -- let me look at my note here to be

10:37:49 15  specific for you.  I believe it was on July 10th.  It had been

16  four days since I previously saw him.  I was off.  When I came

17  back, it was a dramatic improvement.  He was awake, alert,

18  oriented times four, sense of humor.  Very appropriate, highly

19  intelligent.

10:38:13 20  Q    And in your medical opinion, was that due to the fact he

21  was now accepting hydration?

22  A    Yes.

23  Q    Are you in the same room with Mr. Akrawi right now?

24  A    Yes.

10:38:26 25  Q    Have you had an opportunity to examine him this morning?

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:38:29  1    A    Yes.

2    Q    Can you describe for the Court what Mr. Akrawi's physical

3    condition is, and if any labs were drawn or urinalysis was

4    done can you tell us what the results of those were?

10:38:40  5    A    No labs drawn today, but his most recent labs were all

6    within normal limits and the most recent urinalysis

7    demonstrates ketones, which are observable in urine when the

8    body is metabolizing fat rather than glucose or carbohydrates,

9    but not to an extent that it would be an immediate concern.

10:39:10  10   Q    And I understand that Mr. Akrawi is 69 years old; is that

11   correct?

12   A    Yes.

13   Q    I know that Mr. Akrawi is in decent physical condition

14   right now.  Can you describe for the Court if -- basically the

10:39:27  15   process of extended malnutrition and what would happen that

16   would require us to intervene to provide nutrients.

17   A    Much has to do with their condition before going on a

18   hunger strike.  His both physiologic status and percentage

19   body fat status was in his favor.  His body mass index,

10:39:57  20   basically a measure of his percentage body fat, was

21   approximately 32, which puts him kind of in the middle of the

22   range that is considered obese.

23        At this point he has lost approximately 21 pounds and

24   his body mass index is now 30.13, which is right at the very

10:40:20  25   bottom edge of the obese range.  So from a nutritional

10:40:28   1    standpoint, he is looking pretty good.

         2            Now, the criteria that would be the most important in

         3    his specific instant case is his physical examination.  That

         4    would be the factor that would be most important to me.  And

10:40:47   5    if there were any beginning to be crazily out of range lab

         6    results, none of which have been obtained at this point.

         7            The biggest concern that I would have, and I don't

         8    know to what extent this makes all this hearing moot,

         9    Mr. Akrawi is a man of his word and he states he will be

10:41:09  10    eating as soon as this conversation is over.

        11            The problem that can occur subsequent to that is

        12    something called refeeding syndrome in which someone who has

        13    been without significant alimentation, or food, for ten or

        14    more days can have very significant electrolyte imbalances

10:41:34  15    after they begin to eat.  We have taken some precautions

        16    against that.  He's been given and is taking thiamine and some

        17    multivitamins.  And the period after he begins to eat we will

        18    then want to continue to monitor his blood or his electrolytes

        19    and he has always to me agreed that since he began to take

10:42:00  20    hydration that he would allow any medical examination, be it

        21    invasive or not invasive, that I felt it was necessary for him

        22    to have.

        23    Q    How long would Mr. Akrawi be at risk of suffering from

        24    refeeding syndrome after he begins to eat?

10:42:18  25    A    Approximately four days.

DIRECT EXAMINATION - DR. STEPHEN GRAHAM

10:42:22  1  Q   And in the event that something happens and Mr. Akrawi

2  decides not to eat after the hearing concludes today, how long

3  would the government have between you making a determination

4  that Mr. Akrawi was in serious jeopardy of suffering imminent

10:42:46  5  physical harm or death to get nutrients to him?

6  A   How long that would take?  That would be a

7  governmental/legal question.  If he was unable to or refused

8  to accept alimentation, then I guess this process would be

9  something that needed to proceed for the medicolegal

10:43:08  10  purposes --

11  Q   I guess my question was probably inartfully worded.  My

12  question is if you make the determination that he is in

13  serious jeopardy, how long do you have to initiate some sort

14  of nutrition protocol before those effects become permanent

10:43:22  15  or, you know, he dies.

16  A   Well, I would -- the criteria that I've already stated, I

17  would say probably in the order of five or so days.

18  Q   Between when you first determine he's in serious jeopardy

19  and actual, like, irreversible harm would occur?

10:43:42  20  A   Yes.  Again, the most important component of that

21  determination would be his physical examination at this point.

22  Q   And is there anything specifically you would be looking

23  for in the physical examination?

24  A   Yeah.  Changes in his mentation, changes in his ability to

10:44:08  25  perform tasks, changes in his ability to ambulate.

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:44:12  1        Right now, as I was saying previously, his ability to

2   ambulate, other than being orthostatic, meaning if he stands

3   up it takes a little while for the heart to pump blood up to

4   his brain, other than that he ambulates very, very well.

10:44:33  5        MS. BRANCH:  All right.  Doctor, I don't think I have

6   any other questions for you.

7        THE COURT:  All right.

8        Defense counsel.

9        C R O S S - E X A M I N A T I O N

10:44:44 10  BY MR. THOMAS:

11  Q   Good morning, Dr. Graham.  This is Chris Thomas again, one

12  of the attorneys for Mr. Akrawi.  Thank you for making time to

13  speak with us this morning.

14        I'm a poli sci major and working on about three hours

10:45:05 15  of sleep, so I apologize if I was missing some of the nuances

16  in your answers.  It sounds like as we sit here today you do

17  not believe that our client is in any imminent danger of

18  severe bodily harm or death; is that correct?

19  A   That is correct at the moment.

10:45:28 20  Q   And how long would that remain the case, to the extent you

21  can estimate, so long as the status quo persists and he

22  continues to take hydration and the multivitamins and whatever

23  nonfood suggestions that he's agreed to follow?

24  A   I would say if he took no food but continued hydration,

10:45:54 25  vitamins and things of such, his ample body mass index would

10:45:59  1  probably protect him for another week.

2  Q   Now, I understand -- and I met Mr. Akrawi the other day,

3  but only sitting down.  So he is approximately 211 pounds

4  right now?

10:46:14  5  A   210 as of this morning.

6  Q   210.  And what's his height, do you know?

7  A   Five feet ten inches.

8  Q   Five ten.  And I believe you mentioned body mass index is

9  one common measure in your profession for evaluating whether

10:46:33 10  someone is -- tends towards the overweight category; is that

11  correct?

12  A   That's correct.  General breakdown is normal, overweight,

13  obese, and morbidly obese.

14  Q   And the -- Mr. Akrawi is currently a shade above a body

10:46:53 15  mass index of 30 kilograms per milligram squared; is that

16  correct?

17  A   That is correct.

18  Q   And that is above the level categorized by the National

19  Institutes of Health as overweight; right?

10:47:09 20  A   That's correct.  29.99 is considered overweight.  30 to

21  34.99 would be categorized as obese.

22  Q   And what would be the numeric criterion for being

23  underweight?

24  A   Under 20.

10:47:33 25  Q   And for Mr. Akrawi at five foot ten inches, can you

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:47:38 1   approximate for us what the -- his weight would need to be to

2   achieve that body mass index?

3   A   Oh.  I don't have a calculator here, but his weight would

4   probably need to -- you are five ten.  Probably -- I'm going

10:47:58 5   to ballpark this, just shooting from the hip, about

6   125 pounds.  It would have to be a special BMI calculator.

7   Ballpark about 125, 130 pounds.

8   Q   So he's got a considerable ways to go to be underweight.

9   A   Yes.  He has decreased by three points of BMI since he

10:48:23 10   began his hunger strike.  That's been over the course since

11   the 30th of June.  So that is now 13 days, 14 days.  So in 14

12   days he's gone from 33 to 30.  And if you can extrapolate from

13   that rate, that trajectory, the time it would take to get

14   below 20, that's a matter in which you kind of extrapolate.

10:48:50 15   Q   And I'm not a math whiz by any means, but if it took him

16   14 days to reduce his body mass index by -- from 33 to 30, and

17   20 is a level at which you become underweight, sounds to me

18   like it would take another 42, 45 days for him to reach that

19   point; is that correct?

10:49:16 20   A   Yeah, month and a half if it was a linear progression,

21   yes.

22   Q   Now, he is, as I understand it, allowing you to take -- is

23   it urinalysis samples or blood samples or both?

24   A   He will allow us to take whatever samples we feel is

10:49:42 25   necessary.

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:49:43  1    Q    And thus far, what sorts of samples would that include?

        2    A    Blood and urine.  And vital signs, of course.

        3    Q    So blood, urine, vital signs, weight.

        4    A    Yes.  That's a vital sign.

10:50:03  5    Q    Anything else?

        6    A    For the time being, no.  Nothing at this point would be

        7    indicated other than those.

        8    Q    As -- if Mr. Akrawi's hunger strike proceeds, say for the

        9    six weeks estimated duration to the point where he would

10:50:24 10    become underweight, what sorts of additional medical analysis,

       11    if any, would you seek to ask him to allow?

       12    A    Well, pretty much other than radiological, X-ray or CAT

       13    scan, not much else is really in the bank of things that would

       14    need to be done.

10:50:53 15    Q    And thus far, I take it, you have not thought that there's

       16    a need for him to have an X-ray or CAT scan?

       17    A    No.

       18    Q    Is that something you've discussed with him as a future

       19    possibility?

10:51:05 20    A    Not specifically.

       21    Q    And X-rays and CAT scans are not physically intrusive

       22    procedures, are they?

       23    A    That's correct, they are not physically intrusive.

       24    Q    And what sorts of information would they provide to you

10:51:18 25    that you would not get from blood work or urinalysis?

10:51:22  1   A   If he were to have some sort of bowel obstruction from not

2   eating and he was having abdominal pain, then X-ray or CAT

3   scan of the abdominal region would let us know.  Then he would

4   need surgical intervention.

10:51:38  5   Q   Okay.  And you said earlier that he is a man of his word,

6   if I heard that correctly; right?

7   A   That is correct.

8   Q   And if --

9   A   That comes from a former cop.

10:51:52 10   Q   I'm sorry?

11   A   And that comes from the jaundiced eye of me who is a

12   former cop.

13   Q   The -- so I take it if our client agreed to allow X-rays

14   or CAT scans, if we reached a point where you thought that was

10:52:15 15   prudent medically, that would give you additional comfort

16   about his ability to continue the hunger strike?

17   A   Yes.  Mr. Akrawi has told me that he would allow me to

18   order or do anything to or for him that I thought would help

19   prevent any permanent decline of any of his organ systems.

10:52:40 20   Q   What's your -- have you discussed with Mr. Akrawi the

21   reasons for his hunger strike?

22   A   Yes.

23   Q   What has he told you?

24   A   Well, that's what I hoped to have the question asked

10:52:54 25   about, because, again, I have the jaundiced eye of both a

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:52:58  1    former SWAT cop as well as the guy who's at SMU-1 where the

       2    worst Level 5 violators who under maximum security still can't

       3    play like nice children are sent.  So these are the population

       4    that I'm used to.

10:53:12  5         Mr. Akrawi, when he came to this facility, by some

       6    mechanism was separated from what he termed as his people,

       7    which are the Chaldean Christian Iraqi folks, over whom he has

       8    the ability to exert some significant behavioral -- beneficial

       9    behavioral influences.  He was told when he arrived here that

10:53:36 10    he would be re-housed with these same people, but when a

      11    housing opportunity opened up, it was not given to him.  He

      12    feels he was lied to.  And that is really the nidus of his

      13    hunger strike.

      14         The warden with whom I spoke felt subjectively that

10:54:02 15    he thought it was more of a demand on him and, of course, in

      16    corrections we don't acquiesce to demands.  And the warden

      17    also spoke to a number of individuals who are amongst his,

      18    quote, people, unquote, who are now kind of taking the

      19    influential lead and that he asked them, "Hey, do you want

10:54:28 20    Mr. Akrawi to come back?"

      21         And this is where my jaundiced cop eye comes in.

      22    You're asking people who now have new influential ability

      23    amongst other people, "Hey, do you want the boss to come

      24    back?"

10:54:42 25         "No, we don't want him to come back, he doesn't have

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:54:44  1   to come back," blah, blah, blah.

2   So that is another one of the reasons, if I'm not

3   mistaken, that he's maintaining, has maintained, this hunger

4   strike.

10:54:56  5   Q   Pardon my ignorance, but are you familiar with the

6   logistics of the different pods in the facility there?

7   A   No, I'm not.

8   Q   It sounds like you are familiar with the fact that

9   Mr. Akrawi was transferred -- was initially housed with the

10:55:13 10   other Chaldean Christians and later was moved to a different

11   pod?

12   A   Yes.

13   Q   Do you have any understanding of how many people are

14   detained in those two pods separately?

10:55:32 15   A   I would be lying if I told you that I knew.  No.

16   Q   I understand from Mr. Akrawi that the pod that he

17   originally was in, he was with his religious cohorts and

18   thereafter he got moved to a pod that included primarily

19   Muslim detainees.  Is that consistent with your understanding?

10:55:56 20   A   That is consistent, yes.

21   Q   You mentioned earlier that Mr. Akrawi has the ability to

22   exercise some beneficial oversight of the other Chaldean

23   Christian Iraqis?

24   A   Fair number of occasions with my eyes, yes.

10:56:19 25   Q   Did you observe any of those occasions yourself?

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:56:22  1  A    Yes.

2  Q    Can you explain what those included.

3  A    Oftentimes some of the Iraqis are very disrespectful to

4  women.  Extraordinarily disrespectful.  That is probably an

10:56:36  5  understatement.  Mr. Akrawi has -- I've seen him in the

6  waiting room reprimanding some of them for that behavior and

7  telling them if you're going to disrespect them, women who

8  want to help you, don't bother sending in a help request

9  because they're only here to help you.

10:56:54  10  Q    So it sounds like he's an authority figure among his

11  Chaldean cohorts; is that correct?

12  A    Yes, sir.

13  Q    Other than the instance where he dressed down his cohorts

14  for being disrespectful to female staff, is there another

10:57:14  15  incident you can recall?

16  A    No, sir.  Not that I have personally observed.

17  Q    Are there other specific instances you've heard about but

18  not observed personally?

19  A    I have heard from another corrections officer, whose name

10:57:28  20  I don't know, that within the pod that he had influence over,

21  he was able to calm down some rather hot tempers.

22  Q    I assume there's a fair bit of frustration among the

23  populous of detainees; is that correct?

24  A    That would be fair statement.

10:57:51  25  Q    Do you believe that if Mr. Akrawi was returned to the pod

10:57:55  1  with his Chaldean counterparts that that would improve the

2  safety situation in that pod?

3  A   With the information that I have and with my background, I

4  believe that that would be beneficial.

10:58:09  5  Q   You mentioned earlier that you'd spoken to or heard about

6  a warden who opined about his rehousing arrangement.  What was

7  the name of that warden?

8  A   That was Warden McTighe.

9  Q   How is that spelled?

10:58:29  10  A   I wish I could tell you completely correctly.  I believe

11  it is [[M-c-T-I-G-H, but don't depend on that.

12  Q   It's your understanding, correct, that Mr. Akrawi would

13  halt his hunger strike in its entirety if he was returned to

14  the pod with his Chaldean cohorts?

10:58:56  15  A   Yes.

16  Q   He's told that you himself?

17  A   Yes.

18  Q   And since he's a man of his word, you believe him?

19  A   Yes.

10:59:16  20  Q   At one point, I understand that Mr. Akrawi was taken to

21  Mercy Gilbert Hospital; is that correct?

22  A   Yes.

23  Q   And that was in an early stage when he was not taking

24  liquids?

10:59:30  25  A   Correct.

CROSS-EXAMINATION - DR. STEPHEN GRAHAM

10:59:30  1    Q    Is that Mercy Gilbert here in the east Phoenix valley?

          2    A    Yes.

          3    Q    What was the transport time from the facility to there,

          4    approximately?

10:59:43  5    A    I don't know the answer to that.

          6    Q    Did you accompany him on that journey?

          7    A    No.  I was off at that time.

          8    Q    Is that the facility to which detainees are taken when

          9    their condition is beyond what care can be given at the

11:00:04 10    facility itself?

         11    A    There are a number of facilities.  That is one of them.

         12    Q    What are the other available facilities in those

         13    circumstances?

         14         THE COURT:  Mr. Thomas, we're sort of -- hold on a

11:00:16 15    minute, Doctor.

         16         We're kind of turning this into a discovery

         17    deposition.  I don't think that's the purpose.  Let's stay

         18    focused on the issues that are really relevant to the TRO, if

         19    you would, please.

11:00:27 20         MR. THOMAS:  Your Honor, I'm just trying to get a

         21    handle on the imminence factor, and one of the issues we

         22    addressed in our brief was whether deterioration in his

         23    condition should automatically produce a compelled feeding

         24    order or whether there might be an interim measure such as

11:00:47 25    transport to a hospital.

REDIRECT EXAMINATION – DR. STEPHEN GRAHAM

11:00:48   1          THE COURT:  Well, and the government hasn't suggested

           2   they're now seeking an order they can feed him.  If they

           3   conclude it's needed, they will come back to me and you'll

           4   certainly have an opportunity to address those issues.

11:00:59   5          MR. THOMAS:  Then I will move on.

           6   BY MR. THOMAS:

           7   Q   The last question, Dr. Graham.  There was a vague

           8   reference in the declaration of Mr. Almeida about purported

           9   security concerns in returning Mr. Akrawi to the pod with his

11:01:21  10   religious cohorts.

          11   A   I'm unfamiliar with that.

          12   Q   It sounds like, given your prior testimony, you haven't

          13   seen or heard of any basis to think that his return would be a

          14   detriment to security; is that correct?

11:01:35  15   A   I have not personally heard anything like that.

          16          MR. THOMAS:  Thank you.  I have nothing further at

          17   this time.

          18          THE COURT:  Ms. Branch, anything further?

          19          MS. BRANCH:  I do have a couple of questions.

11:01:48  20          R E D I R E C T   E X A M I N A T I O N

          21   BY MS. BRANCH:

          22   Q   Dr. Graham, I just want to be clear.  In order for

          23   Mr. Akrawi to be in danger of imminent permanent physical

          24   injury or death, does he have to actually achieve an

11:02:08  25   underweight BMI or is that something that can happen before

11:02:11 1   that point?

2   A    It can happen before that point.

3   Q    Okay.  So that's what you would be looking for in a

4   physical exam --

11:02:17 5   A    Yes.

6   Q    -- indications that he was in imminent danger, although

7   his BMI might suggest he was still within a normal weight

8   range?

9   A    Yes.

11:02:29 10  Q    And, Doctor, do you have any authority for making housing

11  decisions within the FCC?

12  A    No.

13  Q    Okay.  And are you aware of the factors that go into an

14  inmate's classification or his housing assignment?

11:02:42 15  A    Not at CoreCivic, no.

16          MS. BRANCH:  Thank you.  No further questions.

17          THE COURT:  Thank you, Doctor.

18          Ms. Graham, is there anything else you wanted to

19  present today -- I'm sorry, not Ms. Graham.  Ms. Branch --

11:02:57 20  with respect to the issues we're addressing.

21          MS. BRANCH:  I mean, I think with respect to the

22  issues affecting the TRO, I don't think that Mr. Almeida has

23  anything really relevant to the medical issues.  There's sort

24  of this background noise about he would stop his hunger strike

11:03:18 25  if he were moved into the housing that he preferred.  If you

11:03:22   1    want to discuss those issues, Mr. Alameda can speak to those,

2    but I don't really think they're germane to the issues before

3    the Court today with respect to the TRO.

4         THE COURT: Well, they may become so if you come back

11:03:37   5    and I need to do a balancing. Particularly if I'm applying

6    *Turner*, one of the questions is whether there is a reasonable

7    alternative. If your position is there isn't because of

8    security concerns, I think I need to know that, so we might

9    cover that now.

11:03:51  10         Although before we do, I have a question for defense

11    counsel. The doctor said that Mr. Akrawi said he will start

12    eating after today's hearing. That's the first I've heard it.

13    Is he ending his hunger strike? Do we even need to continue

14    with this proceeding?

11:04:09  15         MR. THOMAS: Your Honor, I apologize for not asking

16    Dr. Graham to clarify that.

17         F U R T H E R    C R O S S - E X A M I N A T I O N

18    BY MR. THOMAS:

19    Q    Dr. Graham, please do so, but I took your statement to

11:04:23  20    mean that Mr. Akrawi had assured you that his hunger strike

21    would end if he was returned to the pod, and I don't recall

22    the specific phrase that was used, but something about when

23    this proceeding was over, and I took that to mean the entire

24    dispute about his rehousing. Can you clarify that for us.

11:04:44  25    A    Yes. There are two components. One, he agreed to end his

DIRECT EXAMINATION - LOUIS AKRAWI

11:04:48  1   hunger strike if he were returned to, quote, his people,

2   unquote, and he also stated to me that he would begin to eat

3   right after this hearing.  It's that simple.

4   Q   When did that discussion occur?

11:05:07  5   A   Yesterday.

6        THE COURT:  So, Mr. Thomas, my question:  Do we have

7   an issue we need to decide if he's going to start eating after

8   this hearing?  Is he ending his hunger strike?  Do you know?

9        MR. THOMAS:  Your Honor, that little tidbit of

11:05:28 10   potential information is news to me.  We certainly have

11   Mr. Akrawi available by telephone, maybe we should ask him.

12        THE COURT:  Let's do that before we do anything with

13   Mr. Almeida.

14        Go ahead, Mr. Thomas.

11:05:47 15        And are you wanting to do this in the form of

16   testimony, Mr. Thomas?

17        MR. THOMAS:  Yes.

18        THE COURT:  Traci, would you place Mr. Akrawi under

19   oath, please.

20            **LOUIS AKRAWI,**

21   called as a witness herein, after having been first duly sworn

22   or affirmed, was examined and testified as follows:

23        D I R E C T   E X A M I N A T I O N

24   BY MR. THOMAS:

11:06:19 25   Q   Good morning, Mr. Akrawi.  Chris Thomas again.  Good to

11:06:21 1    hear from you.  I gather you're feeling well today?

2    A    I'm feeling real well.

3    Q    The -- obviously the judge is trying to understand the

4    nature of our dispute, if any, and can you clarify -- first

11:06:43 5    off, I understand that you have reassured Dr. Graham that if

6    your hunger strike continues, then you will nevertheless take

7    liquids, continue with the multivitamins, continue to allow

8    the blood draws and urinalysis and the physical examinations;

9    is that correct?

11:07:05 10    A    Gave him my word.  Yes.

11    Q    And you will keep that word, will you not?

12    A    Yes.

13    Q    Now, we also -- and I don't know if you've got your

14    declaration in front of you or not, and I know that you have a

11:07:24 15    little bit of trouble with your cataracts, but if you do,

16    maybe we can address some of the things in your declaration.

17         I'm sorry?

18    A    I don't need it.  Go ahead.

19    Q    Okay.  Can you move a bit closer to the phone by any

11:07:42 20    chance?

21    A    Yes.  Go ahead.

22    Q    All right.

23         Now, Dr. Graham appears to be under the impression

24    that regardless of the outcome of today's hearing, you are

11:07:54 25    going to resume eating starting later today or tomorrow.

DIRECT EXAMINATION - LOUIS AKRAWI

11:08:01 1    A    Yes, I'm going to be on liquid diet.

2    Q    Okay.  Gotcha.  So when he said that you had agreed to

3    begin eating, what he meant --

4    A    Yeah --

11:08:13 5    Q    I'm sorry?

6    A    Yes.  He knows.  I told him that and we agree, and I gave

7    him my word and I'm not going to break my word.

8    Q    Okay.  So what Dr. Graham meant by eating was adding

9    liquid nutrition to the water that you're already ingesting;

11:08:32 10   is that correct?

11   A    Yes.

12           DR. GRAHAM:  Mechanical sauce.

13           MR. THOMAS:  What's the nature of the liquid

14   nutrition you will be adding to your diet?

11:08:48 15           DR. GRAHAM:  May I interject since he's probably not

16   aware of that.  This is Dr. Graham.

17           MR. THOMAS:  Please do, yes.

18           DR. GRAHAM:  Basically, it is a regular diet pureed

19   and slightly reduced calories because we don't want to give a

11:09:05 20   person who's been fasting for so long a full calorie load at

21   first.  So it will be basically pureed regular food, which

22   makes it easier for his kind of shocked system to deal with.

23           MR. THOMAS:  Okay.  Now, is it your understanding

24   that that's an alteration in his hunger strike rules, for lack

11:09:34 25   of a better word, or is that a transitional measure before he

DIRECT EXAMINATION - LOUIS AKRAWI

11:09:38  1    resumes eating regular food?

2         DR. GRAHAM:  That's a transitional measure.

3         MR. THOMAS:  And so what is your understanding of how

4    long the pureed regular food regimen will be necessary?

11:10:01  5         DR. GRAHAM:  As you've heard in all hospitals, as

6    tolerated.  When he begins to tolerate slightly firmer and

7    firmer food, we progress to that.  When he begins to tolerate

8    what is essentially a regular diet, then it goes to that.

9    It's however fast his individual personal system can tolerate

11:10:15 10   it.

11        MR. THOMAS:  Okay.  When we spoke earlier about your

12   sense of whether Mr. Akrawi was in imminent danger should his

13   hunger strike continue, I wasn't aware of the pureed food

14   wrinkle.  I gather that the addition of the pureed regular

11:10:43 15   food will further minimize the risk Mr. Akrawi will be

16   severely ill or face death in any near term?

17        DR. GRAHAM:  Yes.  Excluding the possibility of what

18   I described earlier as the refeeding syndrome.

19        MR. THOMAS:  Okay.  As long as we've got you again,

11:11:03 20   Doctor, counsel for the government asked you whether, in

21   addition to body mass index and weight --

22        THE COURT:  Mr. Thomas, let's not use this as a

23   re-cross.  I'd like to stay on the task.

24        It sounds to me from what Dr. Graham just said that

11:11:22 25   your client's ending his hunger strike.  Would you ask him if

11:11:25  1    that's true.

2         MR. THOMAS:  Of course.

3    BY MR. THOMAS:

4    Q    Mr. Akrawi, can you --

11:11:31  5    A    Yes --

6    Q    -- get back to the phone and clarify what your intentions

7    are for us.

8    A    I am finishing it.  I gave him my word.  After this I will

9    eat.  I mean I will be on a liquid diet.  And after that, if

11:11:45 10    they're still not going to move me with my people, I can go on

11    hunger strike again.

12    Q    Okay.  It's important for the purposes of the Court making

13    a decision to know whether we have a dispute or not that he's

14    in a position to decide, and so I'm a little confused, I must

11:12:14 15    confess.  I think the judge is as well.

16    A    Let me clarify it for you.

17    Q    Okay.

18    A    My first strike was a week before this.  It was four days.

19    The head of ICE, supervisor of ICE of Arizona, promised me in

11:12:33 20    different prison, they took me to different prison, he

21    promised me he will take me with my people and end the hunger

22    strike.  He would do -- the guy, he came and talked to me.  He

23    was man of his word.  And I got a witness, two nurses, and he

24    said in front of them, "If you end your hunger strike, we'll

11:12:56 25    take you back with your people."

11:12:57 1    So I end my hunger strike.

2    Monday they move me, took me back to this facility.

3    They put me in different pod.  And I asked them why they put

4    me here, they're supposed to put me with my people.

11:13:09 5    They said, "Tomorrow we'll move you."

6    Tomorrow come, they said, "Tomorrow we'll move you."

7    Tomorrow come, they said, "Tomorrow we'll move you."

8    They said, "We have no room yet.  Let's go ask some

9    people, see if they move to the other pod and we'll move you

11:13:23 10    there."

11    So they went and asked some couple of Muslims and

12    they said, no, we're not moving to that pod, because they're

13    different Muslims.  Some of them extremist and some of them

14    they're not, you know.  So they don't want to move.  And I

11:13:36 15    don't blame them.

16    I wait.  And there was a room empty, so I went to the

17    sergeant and I said, "There's a room empty."

18    He said, "Tomorrow for sure I'll move you."

19    Tomorrow come.  I don't know who it was, he came in

11:13:49 20    and said, "No, we're not going to move you."

21    I said, "Why?  What's the reason?"

22    He said, "We're not going to move you."

23    I said, "Okay, then I'm going on hunger strike again

24    because you guys lied to me."

11:13:59 25    They lied to me.  They tell me they're going to take

11:14:03  1   me with my people.  They didn't.  So I went on hunger strike.

2   Where I am now.

3   Q   Thank you for that.  And I understand you're feelings

4   about how you've been treated.  In order to provide the Court

11:14:17  5   with some guidance about whether he needs to rule, if -- are

6   you telling us that you've decided that you will end your

7   hunger strike at present, without the rehousing and the

8   Chaldean pod issue being agreed?

9   A   No, I didn't say that.  I said after the court, to

11:14:49 10   Mr. Graham, I'll go on liquid diet.  That's all I said.  I

11   didn't say why decision.  After the court I said.  That's all

12   I said.

13   Q   Okay.

14   A   I still want to move with my people.  Because I promised

11:15:01 15   four families, their kids are here, they've never been in

16   Iraq, they never see Iraq, they were 18 months, some of them,

17   some of them three years, I promised them if we go to Iraq --

18   they don't even speak Chaldean or Arabic.  I promised their

19   family I'll take them under my hand when we go to Iraq and

11:15:21 20   I'll take them some safe place and get them some paper and get

21   them out of the country.  And I'm not going to break my

22   promise.

23       What they're doing, they want me to break that

24   promise because if I'm not with them, they're not going to

11:15:32 25   learn anything about Iraq.

DIRECT EXAMINATION - LOUIS AKRAWI

11:15:34  1        Police and everybody in Iraq is different from police

2    in United States.  These people only live in United States.

3    They don't know anything better.  So if they talk to the

4    people the way they talk to people here, they will be shot in

11:15:46  5    the first week.  So I don't want that happening, and I

6    promised the family and I promised the kids I will take them

7    with me.  But I got to train them to be talking to the people

8    over there how to talk to them.  The culture is different, the

9    police is different, everybody there is different.

11:16:09 10    Q   Understood.  Now, I suspect the judge may want to ask you

11    a couple questions himself since he used to be a very fine

12    attorney.  Let me ask this again.  So presently your intent is

13    to conclude your hunger strike, but you may go on a new hunger

14    strike in the future if the housing arrangement is not

11:16:34 15    resolved to your satisfaction?  Is that where we are?

16    A   It's not my satisfaction, it's good for everybody.  It's

17    good for the facility, it's good for me to train these people.

18    These people never have to argue with them every day, they

19    don't have to ride against them every day, don't have to call

11:16:51 20    them names.  Both sides, they're treated bad.  The officers

21    and prisoners, they're treated bad because when you're bad

22    with the officer, officer is going to be bad with you.

23        THE COURT:  Mr. Akrawi --

24        THE WITNESS:  They --

11:17:04 25        THE COURT:  Mr. Akrawi, let me interrupt you.  I

11:17:06  1    understand the points you are making and why you hold those

2    views.  The key question, though, that I think Mr. Thomas

3    asked you that I need an answer to is, is this a correct

4    statement of your position:  You will start taking liquid

11:17:19  5    nutrition today --

6             THE WITNESS:  Yes.

7             THE COURT:  -- but if you are not moved back to your

8    people, then you will likely go on a new hunger strike or

9    continue this hunger strike?  Is that accurate?

11:17:33  10            THE WITNESS:  Yes.

11            THE COURT:  Okay.

12            Mr. Thomas, I think that clarifies what I needed to

13   clarify.

14            Thank you, Mr. Akrawi.

11:17:46  15            THE WITNESS:  You're welcome, sir.

16            THE COURT:  Let me tell you, Counsel, what I'm

17   thinking.  It seems to me we still have the issue.  We don't

18   know that the facility is going to make a change in location

19   for Mr. Akrawi, therefore there is still a very real

11:17:59  20   possibility that he will continue this hunger strike or go on

21   a new hunger strike.  And what I ought to do in light of that,

22   and with what I think is the parties' agreement, is continue

23   the TRO that allows medical monitoring and liquids, but does

24   not allow forced feeding and requires the government to come

11:18:18  25   back in and seek that if this were to get to a point where

11:18:22 1   Dr. Graham feels it's necessary to prevent serious bodily

2   injury or harm, and I would not include in that TRO any

3   authority to restrain him.  Although I think I would want to

4   say that beyond what normal institutional policies provide.

11:18:41 5   Obviously he's being restrained.

6          It seems to me I ought to keep that in place in light

7   of the fact Mr. Akrawi may well be on a hunger strike tomorrow

8   or the next day because he doesn't know if he's going back to

9   his people.

11:18:55 10         I guess my question, first, is to Ms. Branch.  Do you

11   agree with that?

12         MS. BRANCH:  I don't disagree, but I would ask that

13   if you continue the temporary restraining order to allow for

14   medical monitoring, that there is something in there that

11:19:09 15  allows us to physically restrain him, if necessary, to get

16   blood or urine samples.  Right now he's been providing them

17   voluntarily.  But in the event he stopped voluntarily

18   providing it, the temporary restraining order allowing medical

19   monitoring is a little toothless if there is no, essentially,

11:19:25 20  enforcement mechanism for the facility.

21         MR. THOMAS:  May I respond, Your Honor?  And

22   Dr. Graham has characterized Mr. Akrawi as a man of his word.

23   There's no reason to believe he's going to renege on that

24   commitment.  We do object to any addition to the TRO that

11:19:45 25  allows compulsion to be used to enforce that.  It also seems

11:19:53  1    quite evident from the doctor's testimony that if we assume

2    some day that would happen, that we have the luxury of quite a

3    bit of time to bring that issue before the Court.

4              THE COURT:  Mr. Akrawi, this is Judge Campbell again.

11:20:06  5              THE WITNESS:  Yes, sir.

6              THE COURT:  Even if you continue your hunger strike

7    or go back on a new hunger strike, are you agreeable to

8    allowing Dr. Graham, or other medical professionals there, to

9    monitor you with checking your vital signs, doing blood

11:20:27 10    samples and urine samples?

11              THE WITNESS:  Yes, sir.  I gave my word to

12    Mr. Graham.

13              THE COURT:  And are you agreeable that even if you

14    continue your strike or go on a new strike, you will continue

11:20:37 15    to take liquids?

16              THE WITNESS:  Yes.

17              THE COURT:  All right.  With that assurance I'm not

18    going to require restraint because he said that directly to me

19    and I'll accept him at his word.

11:20:49 20              That, to me, is the TRO we ought to continue in

21    effect.

22              Whether or not we need to cross another bridge really

23    depends upon whether -- well, number one, whether a strike

24    continues, and, number two, if so whether Dr. Graham concludes

11:21:01 25    that Mr. Akrawi is getting into a range where he's risking

11:21:05  1    serious bodily injury or death.

2        We've been at this for an hour and 20 minutes.  I

3    have four other hearings today.  I still have work to do to be

4    ready for those, so I can't continue this much longer.  So I

11:21:20  5    don't think we ought to do testimony from Mr. Almeida at this

6    point.  We can do that at another hearing if we need to.

7        Mr. Takei, I did want to give you an opportunity to

8    make the points you want to since you're here, so why don't we

9    give you five or ten minutes to cover that, and then we'll get

11:21:37 10    final comments from other counsel.

11        MR. TAKEI:  Thank you, Your Honor.

12        My name is Carl Takei.  I'm a staff attorney for the

13    ACLU's national prison project.  What that means is my entire

14    litigation docket is centered around prisons, jails, detention

11:22:02 15    centers and other places of confinement.  We greatly

16    appreciate the fact that the Court reached out to the ACLU to

17    appoint counsel for Mr. Akrawi precisely because this is an

18    area of law that is complex and nuanced, and yet is often

19    litigated with pro se litigants going up against the

11:22:22 20    government and there are important doctrinal issues that are

21    glossed over in those proceedings, often because of the fact

22    that it is pro se.

23        The larger backdrop, of course, is that *Turner*, which

24    is the case that the government argues applies to this case

11:22:40 25    and has been applied in a number of pro se hunger strike cases

in prisons and jails, is a standard that comes from the prerogatives of prison administrations dealing with sentenced prisoners.

This is a context in which the prison has the authority to engage in incredibly coercive acts by virtue of the fact that somebody has been sentenced and therefore may be punished by the State. So in the name of both punishment and rehabilitation, the State can intrude on First Amendment rights and other rights in ways that are impermissible in circumstances where people are held in the custody of the State but not for the purpose of punishment.

And what's developed over the years are for the -- and I should say these lines have been drawn and blurred somewhat sloppily, often because of pro se cases. But the general categories are that there are the cases where *Turner* clearly applies, which are in prisons with sentenced prisoners.

There are cases involving pretrial detainees where doctrinally *Turner* should not apply. That's another standard, *Bell versus Wolfish*, that applies specifically to pretrial criminal detainees.

And in the Ninth Circuit the -- I can go into a long discussion of *Bell versus Wolfish* and some of the inconsistencies there, but what we're dealing with here is not a circumstance where, in the Ninth Circuit, there has been the

11:24:26 1    kind of doctrinal sloppiness that the Ninth Circuit has

2    engaged in in the pretrial detention context or that other

3    circuits have engaged in in the civil detention context.

4         Here in the Ninth Circuit, *Jones versus Blanas*

11:24:40 5    governs the issue surrounding conditions of confinement for

6    people held in civil detention.  And the basis of that is

7    substantive due process because, unlike the context in which

8    most *Turner* cases come up, the Eighth Amendment, the State has

9    no right to punish people in civil detention because the

11:25:06 10    purpose of civil detention is never properly to punish.

11         For that reason, in *Jones versus Blanas* the Ninth

12    Circuit held that people held in civil detention have to be

13    given more considerate treatment than those in criminal

14    custody.

11:25:27 15         THE COURT:  Let me interrupt you, Mr. Takei, for just

16    minute.  It just occurred to we have Dr. Graham and

17    Mr. Almeida listening to all of this.

18         Dr. Graham and Mr. Almeida, we'll go ahead and excuse

19    you if you need to get back to work.  Obviously, let's keep

11:25:40 20    Mr. Akrawi on the line, along with his counsel.

21         Sorry for that interruption.

22         MR. TAKEI:  Thank you, Your Honor.

23         So under *Jones*, a person in civil detention must be

24    given more considered treatment than both pretrial criminal

11:26:01 25    detainees and sentenced prisoners.  And there is actually a

presumption that if somebody, for example, is a civil detainee
housed in jail, treated exactly the same as other jail inmates
in criminal custody, that that treatment is punitive and
therefore impermissible and violates the individual's
substantive due process rights.

And let me know if I'm going to too fast.

*Jones*, I should note, has been applied in Arizona to
immigration detainees.  There is a case*, Doe versus Johnson*,
involving immigrants in the custody of Customs and Border
Protection that we cited in our brief where the District of
Arizona applied *Jones* to the rights of those immigration
detainees.

The root of *Jones* is *Youngberg versus Romeo*, which is
another civil detention case.  And if you look at the case
law, most of the civil detention cases are in the, you know,
sort of mental hospital types of contexts or, in some cases,
schools and other special needs contexts.  But the essence of
what *Youngberg* and *Jones* do, which is absent from the *Turner*
line of cases, is actually balancing the liberty interest at
stake for the individual against the government's asserted
interest.

If you look at the four *Turner* factors, none of those
actually weigh the importance of the individual right at
stake, they merely examine the practicalities of whether it
could be accommodated in the prison environment and whether it

11:27:56   1   interferes with any of the prerogatives of the prison in

2   punishment and rehabilitation, and what the particular

3   evidence is that the government has produced about the

4   relationship between the restrictions that it imposes and

11:28:15   5   those particular penological interests.

6        So in this context where we're talking about an

7   individual who is held in a form of civil detention and the

8   government is seeking a medical intrusion that implicates both

9   his First Amendment rights and his right to bodily integrity

11:28:34  10   under substantive due process, the proper test is *Youngberg*

11   which governs medical decision-making in civil detention

12   contexts.

13        And under *Youngberg* the -- it looks to

14   decision-makers who are qualified professionals able to make

11:28:55  15   these sorts of medical judgments.  That would include

16   Dr. Graham.  It would not include Mr. Almeida because, as far

17   as we understand, Mr. Almeida has no medical qualification

18   whatsoever.

19        In that context, the analysis under *Youngberg* is, is

11:29:20  20   the person who is making the decision to engage in a

21   particular medical intrusion a qualified professional and are

22   they acting in a manner that does not substantially depart

23   from professional standards, policies, or other norms.

24        And, you know, as applied here, the issue of

11:29:44  25   force-feeding a competent adult raises extremely troubling

11:29:48 1  medical issues that put it outside of that zone of regular

2  standards and ethics that govern medical practice. And for

3  that reason, if -- Dr. Graham is not taking this position

4  today, but if he were to take that position in the future,

11:30:07 5  that would no longer be accorded the deference that is due

6  normally to the judgment of a qualified professional.

7  Turning to Mr. Almeida's arguments, there are

8  basically two approaches that the Ninth Circuit has taken when

9  dealing with non-medical decisions made that interfere with

11:30:32 10  the rights of people in civil detention. One is to simply

11  decide this individual who is making the decision is not a

12  qualified professional, therefore their decision is not due

13  any deference and holding it unconstitutional. Or sometimes

14  going to the second prong and saying that it violates

11:30:57 15  professional norms.

16  The other approach, which is probably truer to the

17  spirit of *Youngberg*, is to simply balance the liberty interest

18  against the asserted non-medical governmental interest. And

19  the key case there is a case involving civil detainees who

11:31:16 20  were held in a Department of Corrections facility. I'm sorry,

21  I'm bad at remembering case names, so I have to look at my

22  notes on this. That was *Sharp versus Weston*. Sorry, *Sharp*

23  *versus Weston* went the no-deference route.

24  *Oregon Advocacy Center versus Mink* balanced the

11:31:44 25  liberty interest and freedom from incarceration versus state

11:31:49  1    interests directly in a case involving incapacitated criminal

2    defendants who were awaiting restoration proceedings.

3             The facts there were that these individuals were

4    facing criminal charges but not competent.  There was a

11:32:06  5    mechanism available to place them in a mental institution that

6    would restore them to competency, but for various resource and

7    logistical reasons, they ended up languishing for long periods

8    of time in county jails where none of the purposes of that

9    civil detention were satisfied.  And in that case the Ninth

11:32:30 10    Circuit, as I said, simply balanced their liberty interest

11    against the asserted governmental interests.  That's what we

12    would suggest would be appropriate here in dealing with

13    Mr. Almeida's asserted security and administrative convenience

14    arguments.

11:32:47 15             THE COURT:  Okay.  Thank you.  I understand that

16    point.

17             You don't need to respond, Ms. Branch, because I'm

18    not going to decide this issue today, and you obviously

19    haven't been able to read the cases.  But that will be helpful

11:32:57 20    background if we do have to address it later.

21             Thank you.

22             Counsel, what I'm inclined to do is enter the order I

23    described, make it a preliminary injunction, not a TRO because

24    a TRO, as you know, will expire in nine days and we'll be back

11:33:12 25    here again.

11:33:14  1        The preliminary injunction will remain in place and

       2   if the issue is resolved, if Mr. Akrawi is moved and there's

       3   no threat of future hunger strike, it seems to me you all

       4   could stipulate to end the case.

11:33:30  5        If it's not resolved and he continues, then my

       6   preliminary injunction will be in place for purposes of

       7   monitoring and hydration.  And if the government thinks

       8   something more serious is needed, including restraints, you

       9   can come back to me and I'll be able to hear you, presumably

11:33:51 10   within a day or two, which should be well within the five-day

      11   period Dr. Graham said would be critical.  So that is my

      12   intention.  And I won't address the *Youngberg* versus *Turner*

      13   issue until we've had an opportunity for more briefing and

      14   argument and until it's ripe.

11:34:11 15        Any other thoughts you all wish to share on those

      16   issues?  Or anything else we ought to talk about today?

      17        MS. BRANCH:  Nothing from the government, Your Honor.

      18        MR. THOMAS:  No, Your Honor.  We will agree with your

      19   proposed approach and we'll see if we can get this case

11:34:24 20   settled in the meantime after that order comes out.

      21        THE COURT:  Okay.  Thank you all.

      22        MS. BRANCH:  Thank you.

      23     (End of transcript.)

      24                    *  *  *  *  *

      25

1 ## **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4 appointed and qualified to act as Official Court Reporter for

5 the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8 a full, true, and accurate transcript of all of that portion

9 of the proceedings contained herein, had in the above-entitled

10 cause on the date specified therein, and that said transcript

11 was prepared under my direction and control, and to the best

12 of my ability.

13

14          DATED at Phoenix, Arizona, this 24th day of July,

15 2017.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                 Official Court Reporter

21

22

23

24

25